**EQUITY CONTROL ASSOCIATES, LTD., Appellant,**

v.

**David ROOT, Rita Root and D & R Farms, Inc., Appellees.**

**No. 99–1459.**

Supreme Court of Iowa.

Dec. 19, 2001.

Rehearing Denied Feb. 6, 2002.

---

* Senior Judge assigned by order pursuant to Iowa Code section 602.9206 (2001).

Michael G. Byrne of Winston & Byrne, P.C., Mason City, for appellant.

Christopher C. Foy of Leslie, Collins & Foy, Waverly, for appellees.

TERNUS, Justice.

This case provides our court with its first opportunity to interpret and apply the Iowa Loan Brokers Act, Iowa Code chapter 535C (1995). The district court held that the appellant, Equity Control Associates, Ltd., charged an advance fee to the appellees, David and Rita Root, when it contracted with them to assist in obtaining financing for their turkey operation. Be-

cause such a fee is prohibited by Iowa Code section 535C.2A, the court rejected Equity Control's claim to recover its contractual fees and awarded the Roots statutory penalties and attorney fees. Equity Control appealed and we affirm.

## I. *Background Facts and Proceedings.*

David and Rita Root are husband and wife and have been engaged in farming for many years in Bremer County, Iowa. At the time of the events giving rise to this lawsuit they operated a turkey farming operation through a corporation they formed in 1981, Tripoli Ag Center, Inc.

In 1992 Tripoli Ag began to experience financial difficulties. By 1996 the corporation had long-term indebtedness in excess of $840,000 and short-term debt of roughly $150,000. Most of the long-term debt was in the form of loans from or guaranteed by the Small Business Administration (SBA). The remaining indebtedness was owed to local banks.

With the assistance of their attorney the Roots were able to negotiate a compromise of their delinquent debts with the SBA. The SBA offered to accept a lump-sum payment of $287,000 in full payment of Tripoli Ag's indebtedness to the SBA, provided payment was made by October 29, 1996. This compromise gave the Roots ninety days to obtain the necessary funds.

David's mother agreed to loan the couple $120,000, but by the middle of September, the Roots had not secured a commitment from another lender for the balance of the required funds. Only one bank, Security State Bank of Waverly, had even shown any interest in making a loan, but it was dragging its feet in making a decision on the Roots' application. With the deadline rapidly approaching, the Roots had little hope that they would obtain the funds necessary to prevent the SBA from foreclosing on Tripoli Ag's assets, as well as the Roots' personal assets that also secured the loans.

It was about this time that a turkey feed supplier told the Roots about Equity Control Associates, Ltd. and its president, Gerald Murphy. The Roots were told that Murphy had been able to get loans for other troubled turkey farmers.

Equity Control Associates, Ltd. is a professional services corporation in Clear Lake, Iowa, managed by its president, Gerald Murphy. Murphy described his occupation as a professional business planner. He also performed accounting work, but was not a certified public accountant. He was, however, a certified financial planner, a certification he had obtained through home study. Although Murphy had experience in farm loan restructuring and reorganization, he testified his primary business was "business planning with business acquisitions, mergers, startups, [and] consulting for banks."

Rita Root contacted Murphy by phone on September 14, 1996. She provided Murphy with background information concerning the Roots' financial situation and informed him of the approaching deadline. Murphy said he would do some "research" on their business and the turkey industry to decide whether to accept their case. Murphy then talked to the Roots' feed supplier and with a representative of a turkey meat processor. Upon learning that the turkey meat processor was willing to consider a three-year contract with Tripoli Ag, Murphy thought the business might become profitable, so he agreed to help the Roots.

Approximately two weeks before the SBA deadline, the Roots met with Murphy. They provided him with financial information concerning their turkey operation such as tax returns and cash flow data and projections. They also executed a

"Compensation and Authorization Agreement" presented to them by Murphy. In pertinent part, the contract stated:

### 3. Duties of EQUITY

In consideration for the compensation paid by Client as set forth in this contract, EQUITY agrees to perform the following duties:

(I.) Business Planning and establishing Business Structures; Tax Planning; Debt Restructuring Strategy; and writing and formulating applications for financing and capital, or any other hourly type of work required by the Client.

(II.) To act as an agent for Client in the procurement of monies, including, but not limited to, operating loans, capital financing and private investment placements for long term financing to purchase, obtain, or get control of turkey facilities (buildings) and related real estate; moving existing debt from one lender to another; locating another lender to pay off existing real estate mortgages or contracts; the purchase of real estate; lines of credit for daily cash flow needs and/or working capital.

. . .

(IV.) To act as an agent for Client in restructuring the following debt of Client. Restructuring the debt of Client shall mean moving debt from one lender to another lender, private or lending institution; changing the terms of indebtedness at an existing creditor; debt "write-down" meaning debt write-off, partially or in total, by any Federal Government Agency i.e. SBA, Bank or any other lending institution. Restructuring shall also include debt write-off from or by any creditor.[1]

According to the contract, Equity Control was to be compensated at the rate of $60 per hour for the services set forth in paragraph 3(I) and was to be reimbursed for its expenses. In addition, the Roots were required to pay a retainer of $1000, to "be deposited in a Client Trust Account," from which payment for monthly charges for fees and expenses would be drawn. In consideration of the services set forth in paragraph 3(II), Equity Control was to be paid 2% of the amount of any loan obtained. Lastly, the Roots were required to pay Equity Control 2½% of any write-down. The contract stated that each percentage fee was "separate and in addition to any fees set forth in this contract for services provided" under other paragraphs of the agreement. The Roots paid the $1000 retainer and Equity Control deposited these funds into its general account, not its trust account.

In the days immediately following this meeting Murphy attempted to persuade Security State Bank to make a loan to the Roots. He reworked the financial figures and prepared a twenty-page document entitled "Loan Request." This document, according to Murphy, was designed to fill in the gaps and correct the problems in the underlying financial information previously submitted by the Roots in support of their loan application. During this time, Murphy also advised the Roots to use the $120,000 from David's mother to form and capitalize a new corporation.

On October 15, Security State Bank turned down the Roots' loan application. Murphy then contacted American Savings Bank of Tripoli, which held some of Tripoli Ag's short-term and long-term debt. There is considerable dispute in the record concerning the negotiations with American

---

1. The agreement submitted by Equity Control to the Roots was a form contract. The services outlined in paragraph 3(III) of the form were not utilized by the Roots and therefore are not at issue in this case.

Savings. Murphy contends he contacted Les Johnson of American Savings and informed him of Murphy's concept of a new corporation and the potential capital infusion from David's mother. Johnson testified he learned of the funds available from David's mother at a meeting with the Roots on October 16. Johnson contended that he had no negotiations with Murphy, but conceded that he did look at the figures presented by Equity Control. In any event, on October 16, 1996, American Savings agreed to provide the loan necessary to meet the SBA's demands, as well as a line of credit. On October 28, 1996, one day before the SBA deadline, the loan was closed. Murphy attended the loan closing and thereafter provided no further services to the Roots.

On October 31, 1996, Equity Control sent the Roots an itemized statement for $14,320.81 ($15,320.81 minus the $1000 retainer). The bill covered services from October 1 through October 28, 1996. Of the total amount, $4,175.81 represented the itemized charges for Murphy's hourly services and expenses, and the balance was calculated using the percentages from the contract applied to the SBA write-down, the new loan and the line of credit. The Roots refused to pay the bill.

Equity Control then filed this lawsuit seeking payment of its charges and attorney fees incurred in collecting its bill.[2] The Roots filed a counterclaim contending that the compensation agreement constituted a "loan brokerage agreement" as that term is used and defined in Iowa Code chapter 535C. See Iowa Code § 535C.2(5). The defendants further contended that the plaintiff's solicitation and acceptance of an advance fee was prohibited by chapter 535C and entitled them to statutory remedies. See id. §§ 535C.2A, .10(1)(e). The defendants sought to recover the $1000 retainer, plus a penalty of twice the amount sought by Equity Control in its petition, as well as attorney fees.

The case was tried to the court. The district court found that the compensation agreement executed by the parties was a "loan brokerage agreement" under chapter 535C and that Equity Control, acting through Murphy, was a "loan broker" as defined in that chapter. The court held that solicitation and acceptance of the retainer violated chapter 535C's prohibition against advance fees. See id. § 535C.10. Based on its findings of fact and conclusions of law, the court entered judgment against Equity Control on its petition. The court also granted damages on the Roots' counterclaim, awarding a statutory penalty in the amount of twice the compensation sought by Equity Control, or $30,641.62. See id. § 535C.10(1). In a subsequent ruling, the district court entered judgment against Equity Control for the Roots' attorney fees in the amount of $6000.

Equity Control appealed. It raises three claims: (1) the district court erred in ruling that chapter 535C applied to the services rendered by the plaintiff under paragraph 3(I) of the contract; (2) the district court incorrectly construed the compensation agreement as a single indivisible contract; and (3) the trial court erred in failing to offset the attorney fee

**2.** In addition to the Roots, Equity Control sued the appellee, D & R Farms, Inc. This corporation was formed by the Roots, as recommended by Murphy, to purchase the assets of Tripoli Ag. The new loan monies and line of credit were extended to D & R Farms, which then used the loan proceeds for the purchase of Tripoli Ag's assets. Tripoli Ag, in turn, used the sale proceeds to satisfy its indebtedness to the SBA. Although D & R Farms was not a party to the compensation agreement, it was made a party to Equity Control's lawsuit. Thus, all references to the defendants in this opinion include D & R Farms.

award by the equitable benefit received by the defendants. The plaintiff makes no challenge to the amount of the penalty imposed.

II. *Scope of Review.*

Because this contract case was brought and tried as a law action, our review is for correction of errors of law. *See Land O'Lakes, Inc. v. Hanig,* 610 N.W.2d 518, 522 (Iowa 2000); *Howard v. Schildberg Constr. Co.,* 528 N.W.2d 550, 552 (Iowa 1995). Where, as here, the case is tried to the court, "[t]he trial court's findings of fact have the effect of a special verdict and are binding if supported by substantial evidence." *Land O'Lakes,* 610 N.W.2d at 522. We view the evidence in a light most favorable to the trial court's ruling. *See id.* Moreover, the trial court's findings are construed broadly and liberally in favor of the judgment. *See Papenheim v. Lovell,* 530 N.W.2d 668, 671 (Iowa 1995).

This court is not bound by the district court's legal conclusions. *See Land O'Lakes,* 610 N.W.2d at 522. Thus, if the court's decision was materially affected by its application of an erroneous rule of law, we must reverse. *See id.*

We review a challenge to the court's award of attorney fees for an abuse of discretion. *See Vaughan v. Must, Inc.,* 542 N.W.2d 533, 541 (Iowa 1996).

III. *Did the Trial Court Err in Concluding that the Contract Violated Chapter 535C?*

A. *Applicable law.* Chapter 535C governs loan brokers and loan brokerage agreements. The statute defines a "loan broker," in part, as "a person who promises to . . . assist in obtaining a loan for another from a third person." Iowa Code § 535C.2(4). Similarly, a "loan brokerage

agreement" is "an agreement between a loan broker and a borrower in which the loan broker promises to . . . [a]ssist the borrower in obtaining a loan." *Id.* § 535C.2(5)(*b* ). A "borrower" is defined as "a person who seeks the services of a loan broker." *Id.* § 535C.2(2). Pertinent to the dispute here, the statute prohibits a loan broker from directly or indirectly soliciting, receiving, or accepting from a borrower "an advance fee as consideration for providing services as a loan broker." *Id.* § 535C.2A. An "advance fee" is defined as "consideration of any type, including a payment . . ., which is assessed or collected prior to the closing of a loan." *Id.* § 535C.2(1).

The statute provides remedies to the borrower for violations of a loan brokerage agreement:

If a broker materially violates the loan brokerage agreement, the borrower may, upon written notice, void the agreement. In addition, the borrower may recover all moneys paid the broker, a penalty of twice the amount of the fee sought by the broker, other damages, and reasonable attorney's fees.

*Id.* § 535C.10(1). The statute gives a non-inclusive list of what constitutes a material violation. *See id.* This list includes "[s]oliciting or obtaining, directly or indirectly, an advance fee." *Id.* § 535C.10(1)(*e* ).

Equity Control concedes that its activities undertaken pursuant to paragraph 3(II) of the compensation agreement consisted of assisting borrowers—the Roots—in obtaining a loan from a third party, thus causing the plaintiff to fall within the statutory definition of "loan broker" for purposes of that portion of the agreement. Equity Control argues, however, that its services as described in paragraph 3(I) and paragraph 3(IV) constituted business planning and debt restructuring, respectively, and did not include giving assistance to the

Roots in obtaining a loan so as to cause the plaintiff to come within the statutory definition of "loan broker." Because the retainer was specified in the contract to be payment toward Equity Control's services under paragraph 3(I) and because Equity Control, according to the plaintiff, was not acting as a loan broker in performing these services, the retainer, argues the plaintiff, was not an advance fee within the scope of section 535C.2(1). The Roots asserted and the trial court held that the compensation agreement was not divisible and, therefore, Equity Control acted as a loan broker for purposes of the entire contract. We now address that issue.

■ B. *Separability of compensation agreement.* Whether a contract is indivisible and entire or divisible and severable is a question of fact. *See Kel–Keef Enters., Inc. v. Quality Components Corp.,* 316 Ill.App.3d 998, 250 Ill.Dec. 308, 738 N.E.2d 524, 538 (2000); *accord* 17A Am. Jur.2d § 414, at 441 (1991). "As a general rule, ... a contract constitutes a single agreement when, by its terms, nature, *and purpose,* it contemplates that each and all of its parts and the consideration stated shall be common each to the other and interdependent." *In re Estate of Claussen,* 482 N.W.2d 381, 383 (Iowa 1992) (emphasis added) (citing *Pac. Timber Co. v. Iowa Windmill & Pump Co.,* 135 Iowa 308, 310, 112 N.W. 771, 771 (1907)). In contrast, a divisible or separable contract "is one where the performance is divided into different groups, each set embracing performances which are the agreed exchange for each other." 17A Am.Jur.2d § 414, at 440. It "differs from [entire] contracts, ordinarily, in one respect only— that on performance by one side of each of its successive divisions the other party becomes liable for his performance of that division." *Id.*

■ Although there are several tests that have been used by courts to determine whether a contract is entire or severable, *see id.* § 415, at 441, we have held that the resolution of this question depends on the parties' intent. *See In re Estate of Claussen,* 482 N.W.2d at 383; *Pac. Timber Co.,* 135 Iowa at 310, 112 N.W. at 771; *accord* 17A Am.Jur.2d § 415, at 441, § 417, at 442–43. The intent of the parties is determined "from the language the parties have used and the subject matter of the contract." *In re Estate of Claussen,* 482 N.W.2d at 383. In addition, the circumstances surrounding the execution of a contract may also reflect the parties' intent. *See Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001); 17A Am. Jur.2d § 415, at 441.

■ We think there was substantial evidence to support the trial court's finding that the parties intended the contract to be entire, that is, that the services and the compensation for them were interdependent, not separable. It cannot be disputed that the Roots' *sole* objective in contracting for Equity Control's services was to obtain assistance in securing a loan. Moreover, although Equity Control argues the Roots needed and Murphy supplied financial planning services, the evidence shows that all activities performed by Murphy were geared toward the objective of obtaining a loan for the Roots. In fact, the itemized bill representing the services performed by Murphy pursuant to paragraph 3(I) of the contract, which he characterizes as only business planning, includes approximately forty-four hours, out of a total of 52.75 hours, directly related to obtaining a loan for the Roots, including the time Murphy spent at the loan closing! Thus, Equity Control's own billing statement belies any intent to compartmentalize its services.

Equity Control argues that the district court's finding ignores the plain language of the contract, which separated the services provided by the plaintiff and attributed a specific payment to each set of services. The contract language must, however, be considered in light of the surrounding circumstances, "regardless of whether the language is ambiguous." *Walsh*, 622 N.W.2d at 503. Thus, "while the severable nature of the subject [of a contract] may often assist in determining intention, it will not overcome the intent to make an entire contract when that is shown. Ultimately, the entirety of a contract depends upon the intention of the parties, and not upon the divisibility of the subject or the number of distinct subjects." 17A Am.Jur.2d § 419, at 444–45.

The record shows the Roots wanted Equity Control to help them find a loan, pure and simple. As Mrs. Root testified, they did not "need any financial planning. [They] needed cash." Equity Control agreed to render various services to assist the Roots in obtaining the necessary cash to preserve their turkey operation. The interdependence of the services to be rendered under the contract is highlighted by Mrs. Root's testimony that Equity Control would not agree to assist them unless that portion of the agreement giving the plaintiff a percentage of the write-down was included in the contract. Similarly, given Mrs. Root's testimony, one could reasonably infer that the Roots would not have signed the compensation agreement had it not included Equity Control's promise to assist them in obtaining a loan. Given the circumstances surrounding execution of the agreement, the plaintiff's drafting of the contract to allocate specific consideration to specific services does not obviate the parties' intent that their agreement was not divisible. Therefore, we find no error in the trial court's ruling that the contract was entire, and not separable.

*C. Loan broker.* Having determined that the compensation agreement was not divisible and that the intent of the parties was to have Equity Control assist the Roots in obtaining a loan, it necessarily follows that the compensation agreement was a "loan brokerage agreement" within the meaning of chapter 535C. As stated above, Iowa Code section 535C.2(5)(*b*) defines a "loan brokerage agreement" as "an agreement between a loan broker and a borrower in which the loan broker promises to ... [a]ssist the borrower in obtaining a loan." As the plaintiff concedes, its agreement with the Roots included a promise to assist them in obtaining a loan. Therefore, the entire contract, being inseparable, was subject to chapter 535C.

The plaintiff contends, however, that it falls within an exclusion to the definition of "loan broker" for "[a]n accounting practitioner, while engaged as an accounting practitioner, who procures loans as an incidental part of the accountant's practice." Iowa Code § 535C.2(4)(*c*). The burden of proof rested on Equity Control to show that it was excluded from the definition of "loan broker." *See id.* § 535C.11A. The trial court concluded that the plaintiff had not met its burden.

Although it was undisputed that Equity Control performed accounting services under the compensation agreement, the trial court correctly noted that the key to the applicability of the exclusion is whether Equity Control procured the loan as an "incidental part" of its accounting practice. The trial court found that loan procurement was not an incidental part of Equity Control's business and there was substantial evidence to support this finding. As the court noted, Equity Control itself described its business as including, among other things, "debt restructuring" and "procurement of capital debt." Moreover,

the record showed that, in the past, Equity Control had assisted other borrowers who needed loans. In addition, as our previous discussion of the nature of Murphy's activities in this matter shows, he was not "engaged as an accounting practitioner" at the time in question, as required by section 535C.2(4)(c); he was engaged to assist the Roots in obtaining a loan.

■ We hold, therefore, that the trial court did not err in holding the accounting exclusion in the loan broker definition did not apply. Accordingly, there was also no error in the district court's finding that Equity Control was a "loan broker" within the meaning of chapter 535C and that the compensation agreement between the parties constituted a "loan brokerage agreement" within the terms of that statute. The only remaining issue is whether the court erred in ruling that the retainer constituted an "advance fee" entitling the defendants to the remedies of section 535C.10(1).

■ D. *Advance fee.* As noted earlier, an "advance fee" includes any payment that is collected prior to closing a loan. *See id.* § 535C.2(1). The retainer paid by the Roots was collected prior to the loan closing and therefore, there is substantial evidence to support the trial court's finding that the retainer was an advance fee under chapter 535C.[3] Section 535C.10(1) unequivocally provides that the collection of an advance fee is a material violation of

a loan brokerage agreement and therefore entitles the borrower to statutory remedies. Accordingly, there was no error in the trial court's conclusion that Equity Control was liable under chapter 535C.

Before we address the issue of attorney fees, we consider one final concern raised by Equity Control. The plaintiff argues that an application of the statute to the financial services rendered here will result in the inclusion within chapter 535C of any activity that may ultimately prove useful to a person in obtaining a loan. We think, however, that this fear is based on a misunderstanding of the decision made in this case. The trial court did not rule, nor do we hold, that mere financial planning subsequently used by the client to obtain financing renders the financial planner a loan broker. The result in this case rests on the totality of the services furnished by Equity Control under the compensation agreement and the indivisibility of those services based on the parties' intent. Consequently, whether an agreement to perform financial planning *in isolation* would constitute a promise to assist in obtaining a loan for another within the meaning of section 535C.2(4) is not an issue in this case.[4]

IV. *Did the District Court Abuse its Discretion in Awarding Attorney Fees?*

The Roots sought attorney fees and expenses of $8532. The district court award-

---

3. Even if Equity Control had deposited these funds in its trust account as it was contractually bound to do, the payment still would have been an advance fee because it was paid prior to closing a loan.

4. Equity Control also argues in its brief that a contractor who makes repairs to a home that ultimately assist a borrower in obtaining a loan secured by the home would be subject to chapter 535C under the district court's interpretation of the statute in this case. The

plaintiff ignores, however, the requirement that a "loan broker" is one who *"promises* to ... assist in obtaining a loan for another." Iowa Code § 535C.2(4) (emphasis added). We doubt that the typical contractual relationship between a property owner and a contractor includes a promise that the contractor will assist the homeowner in obtaining financing. In sum, the plaintiff's anticipation that the scope of chapter 535C will, in the future, be unbridled is simply unfounded.

ed $6000 in attorney fees, or roughly seventy percent of the amount requested. The court reasoned that the disallowed fees were attributable to work on the case performed prior to the filing of the defendants' counterclaim seeking remedies under chapter 535C and to work performed in defense of the plaintiff's contract claims.

As noted earlier, the amount of an attorney fee award is reviewed for an abuse of discretion. *See Vaughan,* 542 N.W.2d at 541. A court abuses its discretion when the grounds or reasons for the court's decision are "clearly untenable" or when the court has exercised its discretion to an extent that is "clearly unreasonable." *Graber v. City of Ankeny,* 616 N.W.2d 633, 638 (Iowa 2000). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.*

Equity Control has two complaints about the attorney fee award. First, it argues there was not sufficient detail in the evidence to allow the court to apportion the attorney fees between those that were recoverable under chapter 535C and those that were not. As a result, contends the plaintiff, fees were allowed that represented efforts to defend against the plaintiff's claim as opposed to fees incurred in asserting the defendants' rights under chapter 535C. Second, Equity Control claims that the district court should have allowed it an offset for the value of the services it rendered to the Roots. We address each argument separately.

With respect to the evidentiary support for the court's decision, we note that the defendants' attorney supported his application for attorney fees with a detailed accounting of the time spent and a description of the work performed on each date. We also point out that "[t]he district court is an expert on the issue of reasonable attorney fees." *Schaffer v. Frank*

*Moyer Constr. Inc.,* 628 N.W.2d 11, 24 (Iowa 2001). As this court observed in *Schaffer,* the district court is in a unique position of having observed the efforts of counsel during the trial and post-trial proceedings. *Id.* Thus, the trial court has the ability to assess the services rendered and their relationship to the various matters at issue. *See id.* We think, therefore, that the itemized statement of attorney fees, combined with the district court's expertise and knowledge of this case, provided ample support for the trial court's decision to award $6000 in attorney fees.

Although Equity Control complains that fees unrelated to the defendants' counterclaim were allowed, it has pointed to no specific portion of the fee award that represents services that were not recoverable under chapter 535C. Furthermore, we find no merit in the plaintiff's criticism of the trial court for failing to give sufficient explanation for its determination that the services rendered were reasonable. A district court is not required to state the precise basis of its award. *See Bremicker v. MCI Telecomm. Corp.,* 420 N.W.2d 427, 429 (Iowa 1988). Thus, the trial court was not obligated to separately address each entry on the attorney's fee statement and explain why it was allowed or not allowed. We conclude, therefore, that the district court did not abuse its discretion in determining the amount of attorney fees allowed in this case.

As a final matter, we consider the plaintiff's argument that the attorney fee award should have been offset by an amount representing the value of Equity Control's services to the defendants. We reject this contention. First of all, the statute makes no provision for an equitable offset with respect to attorney fees. Moreover, the allowance of an offset ap-

pears to be contrary to the statutory remedies that permit a borrower to void the agreement and "recover all moneys paid the broker." Iowa Code § 535C.10(1). In addition, the plaintiff has cited no authority that a statutory award of attorney fees is, as a general proposition, subject to an equitable offset. Lacking any general authority for an offset and lacking any specific statutory authorization for one, the trial court correctly declined the plaintiff's request that the attorney fee award be reduced.

### V. *Summary and Disposition.*

We find no error in the trial court's ruling that Equity Control acted as a loan broker in performing services under its contract with the Roots. The evidence supports the trial court's finding that the parties intended an indivisible contract. We also find no abuse of discretion in the district court's award of attorney fees. The record supports the reasonableness of the amount awarded and there is no authority for allowing an equitable offset for the value of the services rendered by the plaintiff to the defendants. The judgment of the district court is affirmed.

**AFFIRMED.**