Larry **STEWART**, d/b/a Larry Stewart Realty, Plaintiff–Appellant,

v.

Jeffrey P. **SISSON**, Defendant–Appellee.

No. 07–2104.

Court of Appeals of Iowa.

March 26, 2009.

Judith O'Donohoe of Elwood, O'Donohoe, Braun & White, Charles City, for appellant.

Joel J. Yunek of Yunek Law Firm, P.L.C., Mason City, for appellee.

Heard by VOGEL, P.J., and VAITHESWARAN and EISENHAUER, JJ.

EISENHAUER, J.

Larry Stewart, a realtor, sued Jeffrey Sisson to recover a real estate commission based on an alleged oral brokerage agreement. The district court granted partial summary judgment in favor of Sisson and, after a bench trial, dismissed the remaining claims. Stewart appeals, contending the court erred in granting summary judgment on his breach of contract, quantum meruit or unjust enrichment claims and in dismissing his misrepresentation claims after trial. We affirm.

## I. Background Proceedings.

In March 2002, believing he had an agreement to find a buyer and he had procured a buyer for a sports bar owned by Sisson, Stewart filed suit to recover his commission. The district court granted Sisson's motion to dismiss and Stewart appealed. This court reversed the dismissal. On remand, Sisson's motion for summary judgment was granted. The district court held the Sisson/Stewart oral agreement was an unenforceable listing agreement because it was not in writing. Further, the court determined the administrative rule requiring written listing agreements was not unconstitutional. Finally, the court held Stewart was not entitled to recover under equitable doctrines.

Stewart again appealed and in March 2006, the Iowa Supreme Court held the oral agreement was not a listing agreement subject to the administrative rule making oral listing agreements unenforceable upon proper objection. *Stewart v. Sisson*, 711 N.W.2d 713, 719 (Iowa 2006). Noting Sisson had not sought summary judgment based on the separate administrative rule requiring brokerage agreements to be written to be enforceable, the court remanded for a determination of whether "the failure to reduce the agreement to writing precludes enforcement." *Id.* Additionally, the court noted fairness required "both parties be given an opportunity to reframe their arguments." *Id.* at 720 n. 3.

On remand, Stewart's amended petition alleging breach of contract, a violation of

equitable doctrines, constitutional violations, and fraud was before the court. The district court granted partial summary judgment and dismissed the contract, equity, and constitutional claims. The court overruled Sisson's motion for summary disposition of the fraud claim. In November 2007, after a bench trial, the court ruled in favor of Sisson and Stewart now appeals.

We review for correction of errors at law. Iowa R.App. P. 6.4. A district court properly grants summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). A factual issue is "material" only if "the dispute is over facts that might affect the outcome of the suit." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001).

■ The fraud and judicial-admission contract issues were tried to the court. Therefore, "the trial court's findings of fact have the effect of a special verdict and are binding if supported by substantial evidence." *Equity Control Assoc. v. Root*, 638 N.W.2d 664, 670 (Iowa 2001). Additionally, "we view the evidence in the light most favorable to the trial court's ruling." *Id.*

## II. Facts.

In the mid–1990s, Sisson purchased a sports bar. On November 15, 1999, realtor Stewart was one of the bar's customers. Sisson told Stewart he wanted to sell the business and would pay Stewart a ten percent commission if Stewart found a buyer. Sisson wanted $615,000 for the bar and told Stewart he would not sign a listing agreement or publicize the sale because he wanted to avoid both employee turnover and reduced customers. In 1993, Stewart had found a buyer for another Sisson business, The Framing Connection. The parties used a similar arrangement and Sisson paid Stewart a ten percent commission. Also in the past, Stewart had assisted Sisson in residential real estate transactions.

Stewart was unaware the property's eventual buyer, Mike Walter, had been interested in purchasing and operating Sisson's sports bar for a number of years prior to 1999 and had indicated this desire to Sisson on various occasions. For example, shortly after Sisson purchased the sports bar Walter bought a $500 gift certificate, framed it, and stated the certificate was the downpayment on his eventual purchase of the business. Walter owned and managed another business, but he had sold a portion of it in 1995 and was going to be completely divested in 2001.

While Walter was considering making a deal with Sisson, he asked Stewart to show him businesses for sale because he wanted to make "sure I was going in the right direction. I wanted to make sure there was nothing else in town that I didn't know about that might be better for me than [Sisson's sports bar]." On February 28, 2001, Stewart and Walter had a meeting. At the end of the meeting Stewart asked Walter if he wanted to see the numbers from Sisson's sports bar. Walter agreed because he already had financial information directly from Sisson and was curious to see Stewart's information. Walter signed an agreement with Stewart to keep the Sisson information confidential and casually looked through the information for a few seconds: "I just wanted to see if I could see something dramatically shocking."

Immediately after the meeting Walter contacted Sisson because Sisson had not made him aware Stewart was involved in attempting to procure a buyer for the business. Walter called because he thought perhaps Sisson "was going to list it after the fact and try to get more for it than

what we were talking about." Sisson told Walter the property was not listed with Stewart.

Stewart contacted several people who he thought might be interested in purchasing the sports bar, but did not procure a buyer for the business. During this time, the fall of 2001, Walter was working with Stewart on Walter's warehouse purchase. Later, in November 2001, Walter purchased Sisson's sports bar for $450,000. At trial, Stewart admitted there was no agreement with Sisson prohibiting Sisson from marketing his own property.

## III. Contract.

██ Chapter 543B of the Iowa Code regulates real estate brokers and creates a real estate commission empowered to adopt administrative rules. Iowa Code §§ 543B.8, .9 (1999). The real estate commission's rules require all real estate listing agreements and all real estate brokerage agreements to be in writing. Iowa Admin. Code rs. 193E–1.23 (listing contracts, now 193E–11.1), 193E–1.42 (brokerage contracts, now 193E–11.3). Stewart admits the alleged oral agreement is a brokerage agreement. We have explained the rationale for requiring a written contract:

> The nature of real estate transactions ... is such that unfounded and multiple claims for commissions are frequently asserted. Likewise, in absence of a writing requirement employers are able to escape liability by simply denying the fact of employment. We believe the [real estate] commission intended to guard against these evils through the writing requirement. . . .

Buckingham v. Stille, 379 N.W.2d 30, 33 (Iowa Ct.App.1985) (holding agents cannot avoid the writing requirement by characterizing themselves as "finders" rather than "brokers"). The rule requiring written listing contracts is "analogous to the statute of frauds applicable to contracts." Stewart v. Sisson, 711 N.W.2d at 716 (citation omitted). Therefore, oral listing agreements are not invalid, but are "unenforceable under proper objection." Buckingham, 379 N.W.2d at 32 (citation omitted).

██ Before trial, Sisson filed a motion for summary judgment raising an objection to proof of the existence of an oral contract under the administrative rule requiring a written brokerage contract. In dismissing the breach of contract claim, the court stated: "[T]he same considerations and principles governing the enforceability of oral listing agreements should apply a fortiori to alleged brokerage agreements." We agree and conclude oral brokerage agreements, in a manner identical to listing agreements, are not invalid but are unenforceable upon objection.

This conclusion, however, does not end our contract analysis. At the end of the tort trial, Stewart asked the court to reconsider whether the terms of the contract were proven by Sisson's testimony and constitute a judicial admission. Stewart argues a court can enforce an otherwise unenforceable oral contract when the defendant admits the existence of the agreement. See Stewart, 711 N.W.2d at 715 n. 1.

██ We conclude, however, that enforcement is not required under these facts. Even assuming a judicial admission exception, substantial evidence supports the district court's finding: "Stewart mistakenly believed that Walter had been procured by him as a prospective buyer of Sisson's business." We find no error in the district court's analysis, which states:

> Considering all the water already over the dam in this case regarding the preference for written brokerage and listing agreements as reflected in the rulings of this court and the appellate courts, this

court is of the opinion that discretionary application of the judicial admission exception would serve to eviscerate the very purpose of the administrative [rules.] Even if the court were to apply the doctrine, the evidence in this case falls far short of establishing breach by Sisson of the agreement. The unrefuted testimony by Sisson reflects that if, in fact, Stewart had procured a buyer for him, a commission would have been paid.

## IV. Equity.

■ The district court also dismissed Stewart's equitable claims. Stewart argues "nothing in the administrative rule regarding brokerage agreements should bar recovery in equity on the basis of either quantum meruit or unjust enrichment." The district court found persuasive the reasoning in Iowa cases holding a plaintiff/realtor cannot bypass the administrative rule mandating written listing agreements "by relying on an equitable theory of recovery, whether it be quantum meruit or equitable estoppel." *Buckingham*, 379 N.W.2d at 33. *See Maynes Real Estate, Inc. v. McPherron*, 353 N.W.2d 425, 428 (Iowa 1984) (holding a quantum meruit recovery would thwart the purpose of the administrative rule requiring written listing agreements).

There is no logical basis for denying equitable relief in cases involving listing agreements while allowing equitable relief in cases involving brokerage agreements. We conclude equitable relief would thwart the purpose of the administrative rule requiring written brokerage agreements and find no error.

## V. Constitutional Challenges.

■ The court summarily disposed of Stewart's constitutional claims. Stewart argues the commission exceeded its rulemaking authority in promulgating a rule requiring written brokerage agreements. Additionally, Stewart argues the rule vio-

lates both due process and equal protection and amounts to an unjust taking. The district court held Stewart had "not sustained his heavy burden of rebutting the constitutional presumption accorded the administrative rule." The court ruled:

With respect to [Stewart's] constitutional challenges, the *Milholin* case *[Milholin v. Vorhies*, 320 N.W.2d 552 (Iowa 1982) (holding the real estate commission had the authority to require written listing agreements)] seems to dispense with the delegation of authority issue. The *Maynes Real Estate, Inc.* case [353 N.W.2d at 428] further can be extrapolated to conclude that the provisions requiring written brokerage agreements bear a rational relationship to the legitimate governmental purpose of protecting the public from overreaching brokers and are, therefore, sufficient to withstand [Stewart's] due process and equal protection challenges. Additionally, the collective benefit clearly outweighs any specific restraint or interference experienced by [Stewart] by reason of the administrative rule compelling a written brokerage agreement.

■ The real estate commission's rules have the force of a statute. *Hubbell Commercial Brokers, L.C. v. Fountain Three*, 652 N.W.2d 151, 155 (Iowa 2002). Our analysis of constitutional challenges is guided by the principle that "statutes are cloaked with a strong presumption of constitutionality." *Racing Ass'n v. Fitzgerald*, 675 N.W.2d 1, 8 (Iowa 2004) (citation omitted). Therefore, Stewart "shoulders a heavy burden of rebutting this presumption." *See id.*

■ The purpose of the rules requiring a written contract "is for the protection of the public, to establish fair dealings between the parties, standardize the [real estate] procedure and practices ... and to prevent fraud." *Milholin*, 320 N.W.2d at 554 (citation omitted). We agree with the

district court's analysis and conclude Stewart has failed his heavy burden of proving the statute has no rational basis to a legitimate government interest, exceeds the commission's authority, or constitutes an unjust taking. *See Kent v. Polk County Bd. of Supervisors*, 391 N.W.2d 220, 224–26 (Iowa 1986).

## VI. Fraudulent Misrepresentation.

 In order to recover for fraud, Stewart has to prove Sisson made a false representation. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005). Stewart must prove this element "by a preponderance of clear, satisfactory and convincing evidence." *See id.* Stewart alleges the false representation was Sisson's promise to pay him a ten percent commission if he procured a buyer. The district court ruled Stewart failed to meet his burden because "the weight of the evidence" established "Sisson stood ready to pay Stewart a ten percent commission if, in fact, he procured a buyer."

After viewing the evidence in the light most favorable to the trial court's ruling, we conclude the court's finding that Stewart failed to procure a buyer is supported by substantial evidence.

**AFFIRMED.**