# IN THE COURT OF APPEALS OF IOWA

No. 24-1486
Filed April 1, 2026

**Craig Bruggeman d/b/a Bruggeman Realty,**
Plaintiff–Appellee,

v.

**Narnus Property Management, LLC,**
Defendant–Appellant.

Appeal from the Iowa District Court for Lyon County,
The Honorable Nancy L. Whittenburg, Judge.

**AFFIRMED**

Marc Odgaard, Omaha, Nebraska, attorney for appellant.

Micah J. Schreurs of Woods, Fuller, Shultz & Smith, P.C., Sheldon,
attorney for appellee.

Considered without oral argument
by Tabor, C.J., and Greer and Buller, JJ.
Opinion by Greer, J.

**GREER, Judge.**

Narnus Property Management, LLC (Narnus) appeals an adverse summary-judgment ruling dismissing Craig Bruggeman's lawsuit against it. The district court granted Bruggeman's motion for summary judgment because it found the parties had entered into an enforceable settlement agreement. Based on the record made, we affirm the dismissal of the case as Bruggeman was entitled to summary judgment as a matter of law as well as the award of attorney fees and costs.

## I. Background Facts and Proceedings.

In this litigation, Bruggeman sought payment from Narnus for a realty commission he claimed he had earned. Eight days before the November 16, 2023 bench trial, Narnus initiated negotiations to settle the dispute. Through emails, the parties floated different settlement amounts until, on November 10, Narnus indicated it "would be willing to agree to make the payment of $X[1] to resolve this matter." The email also referenced that "a strict and comprehensive non-disclosure provision" would have to be involved. That same day, Bruggeman responded that it "accepts the $X offer, subject to the execution of a settlement agreement that includes a mutual release of all claims and an appropriate non-disclosure provision. Please provide a draft agreement at your earliest convenience."

After seeking Narnus's permission, Bruggeman updated the court that "[t]he parties have reached a settlement, pending execution of a written

---

[1] The district court granted Bruggeman's request for restricted access based upon the "confidential settlement agreement reached between the parties." So, we use "$X" to reflect the amount the parties agreed would resolve the damages request and use "$XX" to reflect the amount the parties agreed would be the liquidated damage award if applicable.

agreement. Trial thus should not be necessary." Narnus was copied on this email chain. The court then acknowledged the purported settlement and thanked the parties for advanced notice of the settlement. It is assumed from the district court's response that the trial date was cancelled.

On this same date, Narnus offered to prepare a proposed settlement agreement (PSA) and send it by Monday, November 13. Instead, Narnus sent the first PSA (PSA 1) on the morning of November 15, the day before trial was previously set to begin. Bruggeman responded mid-afternoon with a red-lined version of the PSA (PSA 2). After reviewing the changes, Narnus objected that the modifications were not "reasonable" and set out its concerns. Several emails followed discussing their disagreements concerning the scope of the nondisclosure agreement and whether it should include liquidated damages in the event confidentiality was breached. Narnus sent the last email of that day's exchange in the late afternoon explaining his position.

After not receiving a response to its last email, late that night, Narnus emailed the court, copying Bruggeman, explaining the parties had not yet reached a final agreement, Narnus had not received a response to its mid-afternoon email, and Narnus was unsure if an agreement would take place. No one responded to Narnus's email that evening.

In the morning, without alerting the court or opposing counsel of this plan, Narnus's counsel started out to Lyon County, apparently believing trial would still be held in the absence of a finalized settlement despite the parties' previous correspondence with the court. Early that morning, continuing negotiations unaware Narnus was heading to court, Bruggeman emailed a new settlement proposal (PSA 3) to Narnus. At this point, Narnus's counsel informed Bruggeman he could not review the draft as he was "currently

driving" but noted that his client "would agree to $XX as [liquidated] damages to get this resolved." Narnus's counsel then suggested if Bruggeman was "agreeable," to bring the latest settlement draft to the courthouse.

Meanwhile, around 9:37 a.m., the court confirmed by email to all parties that it "presume[d] no counsel is present at the Lyon County Courthouse for trial. I know that I am not based on [Bruggeman's] previous email." The court instructed that if settlement is not reached to notify it and a new trial would be set. Narnus's counsel emailed Bruggeman's counsel that he was heading back to his office and would review PSA 3 at that time. Five minutes later, Bruggeman expressed agreement to the $XX liquidated damages amount over email and sent an updated red-lined and clean copy of the PSA (PSA 4), suggesting they could get "signatures today by docusign." Narnus did not respond that day. The next day, Bruggeman inquired about obtaining "final approval for client signatures."

And here is where the wheels came off, so to speak, as Narnus did not respond to the follow-up emails asking about the settlement that Bruggeman sent on November 17 and 20. But on November 22, Narnus's counsel wrote:

> My client is deciding whether or not it wants to enter into this agreement. Your email to the judge was that we had resolved it, subject to there being an executed agreement. After my email to [Bruggeman's counsel] at 3:51 the day prior to trial, I received no response for the remainder of the day. We did not have an executed agreement, and I presumed that we were proceeding with trial. Accordingly, I prepped that night and traveled early the next morning to appear for trial, and wasted six hours on the road. I will get back to you next week.

Despite apparent agreement on the last outstanding issue over the liquidated damage amount, Narnus disengaged from negotiations and failed to respond

4

to several emails from Bruggeman.  Negotiations over any of the PSA 4 terms or any other issues never resumed.

Finally, on December 4, Narnus responded to Bruggeman's request for the signed agreement and indicated it would be sending "another proposal this week."  To this response, Bruggeman gave an end-of-day deadline to sign PSA 4.  After Narnus emailed that no agreement was reached by the parties and that those efforts ended the morning of trial, Bruggeman moved to amend his petition to include a breach-of-contract claim and a request for attorney fees.  The court granted Bruggeman's motion to amend after a contested hearing.

Bruggeman then moved for summary judgment.  The court granted the motion, finding that the parties' initial emails created an enforceable contract and the subsequent correspondence on liquidated damages modified that early agreement.  And the court awarded attorney fees and costs to Bruggeman, based on language in the proposed written contract.  Narnus appeals.

## II.  Standard of Review.

We review a ruling on a motion for summary judgment for correction of errors at law.  *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 800 (Iowa 2019).  "Summary judgment is proper when the moving party has shown there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *EMC Ins. Grp. v. Shepard*, 960 N.W.2d 661, 668 (Iowa 2021) (cleaned up).  We review "the record in the light most favorable to the nonmoving party."  *Slaughter*, 925 N.W.2d at 800 (citation omitted).  On the question of whether a settlement agreement was reached, "the burden of proof . . . is upon the party alleging

same and such burden never shifts." *Atl. Veneer Corp. v. Sears*, 232 N.W.2d 499, 504 (Iowa 1975).

Review of an award of attorney fees is for abuse of discretion. *See NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 469 (Iowa 2010).

**III. Analysis.**

Narnus argues the district court erred in (1) finding the parties' email exchange was sufficient to create an enforceable settlement agreement and (2) awarding attorney fees and costs based on that agreement. Specifically, Narnus contends the parties never formed an enforceable settlement because the terms were still disputed and they did not mutually intend to be bound until after a written agreement was signed. Bruggeman contends the parties agreed to the material terms of the agreement; there were writings, including the final settlement agreement; and there was nothing left to negotiate. Thus, a binding settlement occurred.

"Settlement agreements are contracts"; we apply contract law principles when determining whether a settlement is formed and in interpreting its provisions. *Recio v. Fridley*, 30 N.W.3d 532, 539 (Iowa 2025). "For an agreement to be binding on the parties, they must manifest their mutual assent to the terms of the agreement." *Id.* Overall, "[t]he law favors settlements." *McNeal v. Wapello Cnty.*, 985 N.W.2d 484, 491 (Iowa 2023).

At the summary judgment stage, Narnus focused its resistance on the argument that there could only be a settlement if the parties reduced the terms to a writing and that it never accepted the red-lined versions found in PSA 4 so the parties were not yet done negotiating. We look to the record made at the summary judgment stage, which included affidavits of the

attorneys, the email negotiations, and proposed versions of the settlement agreement.

1. *Was an agreement reached?* Taking each of Narnus's arguments separately, we start with the assertion that the parties did not have a meeting of the minds, thus no agreement that could be enforced. We consider the email exchanges and the various versions of the PSA. On that review, we find that the emails exchanged between the parties established material terms of the settlement: settlement amount, confidentiality, mutual releases, and the liquidated damage amount. *See Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977) (noting that an oral contract can exist even though the parties' intent is to reduce it to a writing later).

We disagree with Narnus that the last version, PSA 4, contained terms yet to be negotiated as most of the language originated from Narnus's own draft language. After comparing the versions of PSA 1, drafted by Narnus, with the final, red-lined version of PSA 4 sent the morning of trial, the changes conformed with the parties' email agreements, such as modifying the release to be a mutual release. There were minor, non-substantive changes to some of the paragraphs, but the main change related to the parties' agreement to be bound by a $XX liquidated damage provision.[2] Thus we view most of the red-line changes as terms that are "actually not essential contract elements but are either optional or matters of implementation." *Id.*; *see also Elkader Coop. v. Matt*, 204 N.W.2d 873, 875 (Iowa 1973) ("It is generally held an oral agreement may be enforceable, even though the parties

---

[2] Bruggeman explained that the changes made in both PSA 3 and PSA 4 were non-substantive, such as deleting that any parties not represented by counsel had the opportunity to have legal counsel review the agreement since both sides were represented and modifying language to include both Bruggeman as an individual and his business.

7

contemplate that it be reduced to writing and signed, if it is complete as to its terms and has been finally agreed to.").

On appeal, Narnus further clarified that the term "an appropriate non-disclosure agreement" as referenced in an email from Bruggeman, is ambiguous and required further elaboration. We see that argument as a red herring. As to what was left to negotiate here, Narnus provides no context. This is "the put up or shut up moment in a lawsuit"; a nonmovant "must show what evidence it has that would convince a trier of fact to accept its version of the events." *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 88 (Iowa 2022) (citation omitted). At the summary judgment hearing, Bruggeman noted:

> I think it's telling opposing counsel hasn't identified a single material term still in dispute by the parties. That's because to the extent there was a dispute, that agreement was amended by their email we accepted.

> Likewise, the redline revisions . . . opposing counsel keeps pointing out, oh, we had sent another redline revision on November 16 in the morning and again with a subsequent email. I will point out to the court that is misleading because the only substantive changes in those redline revisions were the amount of liquidated damages.

We agree with this assessment. At the summary judgment hearing, Narnus only vaguely pointed to PSA 4 calling it "different and ha[ving] material terms that were changed from [the PSA 3 draft]." Contrary to that view, Bruggeman argued,

> we sent an updated formal document that included the exact number of liquidated damages they proposed and we accepted and that was the change made in the final document. The only reason it wasn't signed is because [Narnus] then refused to sign the document that included the terms of their own offer.

From our review, the final draft of the PSA, PSA 4, included nondisclosure language taken from Narnus's original draft, PSA 1, with these non-substantive changes:

> **I.** <u>Confidentiality</u>. The existence and terms of this Agreement are strictly confidential and Plaintiff ~~and their counsel~~ shall not disclose the facts or contents of this Agreement <u>on or after the Effective Date</u> except if: (i) ordered by a court; (ii) in response to a subpoena, order or other request for information received from any government agency or self-regulatory organization; (iii) otherwise required by law; (iv) necessary for disclosures to Plaintiff's <u>spouse,</u> affiliates, related entities, lawyers, employees, partners, tax advisors, and/or accountants (provided that such parties are bound by confidentiality obligations no less restrictive than those set forth in this paragraph); or (v) necessary to enforce the terms of this Agreement. If disclosure is required <u>pursuant to subsections (i) (ii) or (iii)</u>, Plaintiff shall redact all terms relating to the amount of the Payment. If an unredacted version of this Agreement is ordered to be produced by a court of competent jurisdiction, this Agreement shall be produced under a confidentiality agreement <u>or protective order</u>. The Parties understand and agree that money damages ~~would~~ <u>may</u> not be a sufficient remedy for any breach of the confidentiality provisions of this Agreement, and any Party not in breach of the obligations set forth in this Agreement shall be entitled to seek liquidated damages identified herein, injunctive, or other equitable relief to remedy or forestall any such breach or threatened breach. Such remedy shall not be deemed to be the exclusive remedy for any breach of this Agreement, but shall be in addition to all other rights and remedies available at law or in equity.

So, we reject Narnus's contention that "[t]he redlined provisions were the disagreement."

On this record, we do not find that the terms of the settlement and the corresponding conditions as set out in PSA 4, which in large part are Narnus's words, are ambiguous or require additional factual development as it is clear that when read together, they are consistent with the settlement negotiations. "An agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations." *Scott v. Grinnell Mut. Reins. Co.*, 653 N.W.2d 556, 562 (Iowa 2002) (cleaned up). Narnus just refused to sign the document. So we find that the parties formed an agreement as to the terms set out in the settlement agreement, and we move to Narnus's second issue.

2. *Were the parties only bound if they signed a written agreement?* True, the parties continued to negotiate the details of the agreement without ever signing a final written agreement. Yet, looking at the settlement emails and the assorted PSAs, there is competent, undisputed evidence the parties shared an understanding of the settlement terms' scope. *See Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010) ("[C]ontract terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance."). To that end, Bruggeman counters that a settlement need not be in writing to be enforceable. *See Wende v. Orv Rocker Ford Lincoln Mercury, Inc.*, 530 N.W.2d 92, 95 (Iowa Ct. App. 1995) ("A settlement agreement need not be reduced to a writing before it is enforceable unless required by statute or court rule."). But Narnus contends Bruggeman's own words referencing the agreement was "subject to" or "pending" a writing meant the parties could only be bound by a signed writing.

Narnus points to *Emory Industrial Services, Inc. v. Stewart*, 567 F. Supp. 3d 1080 (S.D. Iowa 2021), a federal case, as support for the argument that a signed written agreement was required to make any preliminary negotiations enforceable. *Emory*, however, can be easily distinguished. *See* 567 F. Supp. 3d at 1086–89 (finding that the parties did not enter into a binding and enforceable agreement as they still were negotiating new issues and drafting several contracts after the alleged settlement). Unlike the situation before us, in *Emory*, the parties traded documents *after* their email negotiations, which included a settlement agreement, confession of judgment, and consent decree. *Id.* at 1084. On top of that, these newly drafted documents contained provisions that were never mentioned in the email negotiations. *Id.* at 1087 (noting that after the email negotiations five new issues, not mentioned earlier, were raised). And in a follow-up email

after trading documents, one party characterized the negotiations as being "close" to an agreement. *Id.* at 1085. Thus, the court reasoned that the parties did not reach a binding and enforceable agreement after applying the factors found in *Recker v. Gustafson*, 279 N.W.2d 744, 750–51 (Iowa 1979). *Emory*, 567 F. Supp. 3d at 1086–89. And while we consider the persuasiveness of federal precedent, we are by no means bound by it. *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010) ("The degree to which we follow [federal] precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.").

So we examine how Iowa authority has addressed the *Recker* factors as they offer considerations to help determine whether parties intended to be bound before execution of a written agreement and include:

> whether the contract is of a class usually found to be in writing, whether it is of a type needing a formal writing for its full expression, whether it has few or many details, whether the amount is large or small, whether the contract is common or unusual, whether all details have been agreed upon or some remain unresolved, and whether the negotiations show a writing was discussed or contemplated.

279 N.W.2d at 750–51 (citation omitted); *see also id.* (determining oral negotiations resulted in a contract for sale even though contracts for sale of land are usually found to be in writing).

While a formal writing was required for the nondisclosure agreement, that and the settlement agreement were not unusual or complex, the settlement amount was small, and all details were agreed upon. But, along with those factors, when the totality of the circumstances is consistent with the conclusion that the parties acted as if they had a binding agreement, the agreement will be enforced. *Id.* at 751; *see also McCarter v. Uban*, 166 N.W.2d 910, 913–15 (Iowa 1969) (upholding a proposed lease that contained all

11

essential agreed upon terms, from which one party backed out, after considering that "[t]he existence of an agreement or meeting of the minds should not alone be determined from the words used by the parties, but also from the situation and surrounding circumstances and by the inferences which mankind would ordinarily and reasonably draw therefrom"). Here, the surrounding circumstances are that negotiations were complete, the terms were confirmed, and PSA 4 was primarily in Narnus's language. On top of that, on the day of trial, Narnus emailed that it would "agree[] to $XX as [liquidated] damages *to get this resolved*" and then instructed Bruggeman to bring the agreement to the courthouse. Instead, Bruggeman offered the use of Docusign to obtain signatures on that same day. These discussions suggest that the agreement was complete and the signing of the document was a formality, which would normally be the case in most settlement negotiations that had finalized.

As we see it, the parties came to a meeting of the minds related to the terms and those terms were formalized in a writing—by email. Finding that no material facts were disputed regarding the agreed-upon terms and that continued negotiations were unnecessary, one would expect that the next step would be to simply sign the document formalizing those terms. *See Horsfield Constr. Inc. v. Dubuque Cnty.*, 653 N.W.2d 563, 570–71 (Iowa 2002) (applying the tenets of Restatement (Second) of Contracts section 27 (A.L.I. 1981)). Given our findings, we apply the considerations contained in the comments of section 27 of the Restatement (Second) of Contracts, which provide:

> *a.* Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make

12

a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

*b*. On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*c*. Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 cmts. *a–c* (A.L.I. 2024). We find that comment *a* applies to these undisputed facts.

As a practical matter, in the record developed for summary judgment consideration, we find the emails show standard settlement negotiations, with agreements confirmed through email, that are traditionally memorialized in a written document prior to the dismissal of the lawsuit. The emails reflect the parties' agreement over the specific monetary terms, which have not been disputed by Narnus. For some reason, Narnus simply refused to sign or to respond.

There were no further negotiations following the trial date. Narnus's emails after the trial date suggest irritation over having to travel to the

courthouse, noting "those [settlement] efforts ended the morning of trial" without any discussion over what was disputed in the previous negotiations. At no time were there any subsequent discussions over any terms that remained to be negotiated. It is also telling that, even after the district court instructed if the parties had not yet settled they should ask for a new trial setting conference, Narnus never responded to or acted on that direction. While the parties contemplated that a writing would be needed to memorialize their agreement before the dismissal was filed, it is not legitimately disputed that the agreement was prepared and that it set out the agreed-upon terms. As comment *a* contemplates, an exchange of writings can include "an obligation to execute subsequently a final writing." *Id.* cmt. *a*. And, where the final writing does contain "these provisions and no others, they then have concluded the contract." *Id.* This is what happened here.

Other than the position that Narnus could only be bound if it signed the settlement agreement, it raises no specific contractual defense. And this matter can be distinguished from cases more aptly fitting under comment *b* where the courts have pointed to other terms that were in discussion or had not yet been "assented to." *Id.* cmt. *b*; *see also Faught v. Budlong*, 540 N.W.2d 33, 40 (Iowa 1995) (finding "[t]he parties' prior dealings were simply preliminary negotiations and expressions of terms to be formally memorialized in a written agreement executed by the parties," but no binding agreement was reached in any event because the parties were still negotiating terms); *see also Bradley v. W. Sioux Cmty. Sch. Bd. of Educ.*, 510 N.W.2d 881, 884–85 (Iowa 1994) (finding oral negotiations not binding where matters were still to be decided and considered by the board); *Emp. Benefits Plus, Inc. v. Des Moines Gen. Hosp.*, 535 N.W.2d 149, 153–54 (Iowa 1995) (finding that even though both parties contemplated a written contract, the oral agreement

was enforceable given the parties' intent to be bound based upon the negotiations and actions). No case applying comment *b* deals directly with this fact pattern where the parties agreed to the terms that were included in a writing that was primarily drafted by the party who then refused to sign it.

We find that the parties had a final writing, with substantive terms provided by Narnus, modified pursuant to conditions to which the parties had assented, with the obligation to execute the writing subsequently. With that agreement in place and because Narnus could not identify any term that required further discussion at the summary judgment hearing, the district court was correct, as a matter of law, to enforce its terms.

3. *Award of attorney fees and costs.* Narnus also disputes the award of attorney fees and costs. Narnus first asserts that because there was no binding and enforceable settlement agreement,[3] Bruggeman cannot be entitled to attorney fees. Narnus next argues that even if Bruggeman has established an entitlement to attorney fees, the award was excessive. Narnus has the burden to show the unreasonableness of the requested fee. *See Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009) ("The party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee." (cleaned up)).

First and foremost, Narnus gives us little to go on in its appellate briefing by way of legal analysis. No authority is cited in the argument section of the briefing on this issue. Still, we address the argument that had

_____

[3] We find this argument was waived as Narnus did not cite any authority for its position related to the authority of the court to grant the fees once it established the parties had a binding agreement. *See* Iowa R. App. P. 6.903(2)(a)(8)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

15

Bruggeman just attended the trial and not filed summary judgment, this fee award would be substantially less. We do not agree with that analysis or find that the district court abused its discretion in the award of attorney fees and costs. "A court abuses its discretion when the grounds or reasons for the court's decision are clearly untenable or when the court has exercised its discretion to an extent that is clearly unreasonable." *Equity Control Assocs., Ltd. v. Root*, 638 N.W.2d 664, 674 (Iowa 2001) (cleaned up).

Finding no abuse of discretion, we affirm the attorney fee and cost award.

## IV. Conclusion.

We therefore affirm the grant of summary judgment to Bruggeman, including the award of attorney fees and costs.

**AFFIRMED.**

Tabor, C.J., concurs; Buller, J., dissents.

**BULLER, Judge** (dissenting).

In this close case, I part ways with the majority primarily because of the procedural posture. If everything about the district court's ruling remained the same, but it was entered after a bench trial, I would vote to affirm. But because the decision was rendered at summary judgment, I dissent and would reverse and remand for further proceedings.

At summary judgment, the district court had to view the record "in the light most favorable to the nonmoving party." *Deeds v. City of Marion*, 914 N.W.2d 330, 339 (Iowa 2018). And the court was only permitted to enter summary judgment if the moving party showed there was no disputed "genuine issue of material fact." *Id.* (cleaned up).

As the majority notes, the summary-judgment record here consisted of affidavits from counsel, emailed correspondence, and the various settlement-agreement drafts (including redlines). From these documents, I think there are disputed facts on whether there was a meeting of the minds on all material terms and whether the parties intended to be bound before reducing the agreements to writing.

On materiality, the settlement drafts demonstrate the parties lacked a shared understanding of the term "appropriate non-disclosure agreement." I cannot say the term is unambiguous when reviewing the record in the light most favorable to Narnus and considering Bruggeman's burden. As to whether the parties intended to be bound without a final written agreement, I think the evidence is again equivocal, unless we resort to credibility determinations regarding Narnus's assent and the materiality of certain redlined edits.

There are perhaps fair questions about whether the protestations by Narnus's counsel were made in good faith or concerned material issues. And I certainly understand the district court's frustration below. But I think these disputed fact questions had to be resolved adversely to Bruggeman at summary judgment. *E.g.*, *id.*

Fully recognizing I would likely to come to the same outcome as the district court in resolving disputed fact and credibility questions if the matter had been tried, I reluctantly conclude this case should be reversed based on its procedural posture.