**LAND O'LAKES, INC., Appellant,**

v.

**Donald Joseph HANIG, Appellee.**

**No. 98–1370.**

Supreme Court of Iowa.

April 26, 2000.

As Amended on Denial of Rehearing June 1, 2000.

Reconsideration Denied June 19, 2000.*

---

* CARTER, J., taking no part.

Lawrence A. Moloney of Doherty, Rumble & Butler, P.A., Minneapolis, Minnesota, and Ronald K. Noah of Noah, Smith and Schuknecht, P.L.C., Charles City, for appellant.

Michael G. Byrne of Winston & Byrne, P.C., Mason City, for appellee.

TERNUS, Justice.

The appellant, Land O'Lakes, Inc., commenced this action to recover damages it sustained when the appellee, Donald Hanig, failed to deliver corn to Land O'Lakes, as required by contracts between the parties. The dispute on appeal centers on the adequacy of the assurances provided by Hanig upon Land O'Lakes' demand for reasonable assurance of performance. In a bench trial, the district court ruled that Hanig's assurances were adequate and that Land O'Lakes, not Hanig, had breach-

ed the contracts when it cancelled the contracts based on its dissatisfaction with the assurances of performance provided by Hanig.

Upon our review of the record, we hold there is not substantial evidence to support the trial court's conclusion that the assurances provided by Hanig were adequate. Accordingly, we reverse the district court's judgment and remand for a determination of the damages that Land O'Lakes is entitled to recover for Hanig's breach of contract.

### I. Background Facts and Proceedings.

This case concerns multiple hedge-to-arrive contracts between Land O'Lakes, a grain cooperative, and Hanig, a grain producer. (We have recently discussed in detail the nature of hedge-to-arrive contracts, see Top of Iowa Coop. v. Sime Farms, Inc., 608 N.W.2d 454, 456 (Iowa 2000), and will not repeat that discussion here.) In early 1995, Hanig became interested in trying a multi-year pricing plan, using hedge-to-arrive (HTA) contracts. To effectuate this plan, he entered into a series of HTA contracts, twenty-three in all, calling for the delivery of 155,000 bushels of corn between December 1995 and July 1996. This quantity of grain represented Hanig's entire grain production for a three-year period.

In December 1995 the cash price of corn was high, so Hanig decided to roll his December 1995 contracts to December 1996. Because there was an inverse of thirty-eight cents between December 1995 and December 1996, Hanig rolled his four December 1995 contracts to March 1996 instead, resulting in a modest gain. Hanig subsequently made a timely delivery of 25,000 bushels of corn as required by the March 1996 contracts.

The inverse in the market did not improve and by the spring of 1996, both farmers and elevators were concerned about the market ramifications on HTA contracts. Hanig, for example, had already sold his entire 1995 crop and would

have no more grain to deliver until the 1996 harvest. Therefore, further rolling into late 1996 was inevitable. In April 1996, Hanig chose to roll his remaining contracts to July 1996.

On May 8, 1996, the cooperative sent all producers holding HTA contracts a letter asking that the producers advise the cooperative of their intention to either deliver corn under their July 1996 contracts or roll the contracts to a 1996 crop contract. The cooperative enclosed an article addressing the risks and volatility of the July–December spread or price differential. In response to this letter, Hanig met with the coop's manager, Randy Park, to discuss Hanig's situation. They agreed that a workable solution would be for Hanig to deliver on half the contracts in the fall of 1996 and roll the rest out to 1997.

Subsequent to this conversation the coop adopted a new policy concerning HTA contracts. Park informed Hanig of this policy on June 6, 1996, when Hanig stopped by the coop to discuss his contracts. This policy, which was subsequently sent to all producers on June 8, essentially provided producers with three alternatives: (1) termination of all HTA contracts, subject to payment of a cancellation charge; (2) delivery of the grain and/or rolling the contracts to a new delivery month not later than July 1997; or (3) some combination of the prior two alternatives. The letter ended with this statement: "We believe these alternatives will meet the needs of almost all of our producers with HTAs. We encourage you to come in and visit with us as soon as possible to work out an individual resolution." The coop asked for a response by June 19, 1996. Although Hanig was concerned that he would not be able to roll past July 1997, contrary to the parties' earlier conversation, he acknowledged that Park did not object to any proposal made by Hanig on June 6 other than to say that Hanig could not roll forever.

On June 18, 1996, Hanig delivered four letters to the coop in response to the June

8 letter concerning the coop's new policy on HTA contracts. These letters directed the coop to roll all of Hanig's HTA contracts to December 1996. In addition, Hanig's letters contained the following statements:

> The undersigned repudiates the enforceability of all said contracts in full. The undersigned producer is acting solely to mitigate any damages in the event said contracts are ultimately shown to be enforceable.

> To the extent that the hedge to arrive contracts are later deemed to be legally enforceable, the undersigned specifically reserves all his rights under the contracts between the parties, as originally negotiated and represented at the time of execution of said contracts.

Hanig asked Park to sign these letters, but Park, upon learning that Hanig had legal counsel, declined to do so and referred the matter to the coop's attorneys.

On July 12, 1996, counsel for the coop sent a letter to Hanig informing him that his repudiation of the enforceability of the contracts gave the coop grounds for insecurity regarding Hanig's performance under the contracts. The coop demanded adequate assurances, stating that Hanig's signature on the modified contracts showing the December 1996 delivery dates would be considered adequate assurance of performance. Hanig was asked to come to the coop and sign the contracts on or before July 31, 1996.

A week later, on July 19, 1996, Hanig's counsel responded to the coop's demand for assurances. This letter stated in pertinent part:

> You are correct in that Mr. Hanig has repudiated the enforceability of all of the HTA contracts listed on the June 18, 1996 letter of instructions delivered in person to Randy Park. . . .

> Given the undated notice received June 8, 1996 and your letter of July 12, 1996, which both appear inconsistent with the HTA contracts, Mr. Hanig is unable to execute any further contracts until the terms, conditions and specifications of the same are clearly spelled out, consistent with the original representations made when entering into those contracts.

> If the contracts are determined to be enforceable, Mr. Hanig does intend to perform. I suggest this confirmation is all the "adequate assurance" to which you are entitled.

Hanig went on to specifically contest the contract requirement that he deliver the grain by December 31, 1996, and the coop's adjustment of the price under the rolled contracts to reflect the spread between the old and new delivery dates. Hanig's counsel ended the letter by reiterating that Hanig "specifically repudiates the enforceability of [the] HTA contracts," but that Hanig's counsel would be willing to discuss the matter further.

Although there were some subsequent discussions between the parties with respect to a settlement of their dispute, no satisfactory agreement was reached. Finally, on July 26, 1996, the coop notified Hanig that it would not accept his proposal (1) to deliver 60,000 bushels of the 130,000 bushels covered by the contracts at a price of $2.75 (the prices payable under the contracts varied between $2.14 and $2.67), and (2) to cancel the balance of the contracts at no liability to Hanig. The coop further informed Hanig that it did not consider his proposal to be adequate assurance of his performance, and therefore, the coop had cancelled Hanig's HTA contracts.

The coop subsequently filed this lawsuit alleging that Hanig had breached the contracts. Hanig responded that the coop had breached the contracts by unilaterally modifying the contracts and by cancelling the contracts.[1] The case was tried to the

---

1. Hanig claimed at trial that the Coop's "demand for adequate assurance was unreasonable where those contracts [calling for De- cember 1996 delivery] had been modified from earlier contracts executed by [Hanig]." Hanig focused on two items of claimed unilat-

court. The court found that Hanig's June 18, 1996 letter gave the coop reasonable grounds to be insecure about Hanig's performance. The court then concluded that Hanig's July 19, 1996 letter, in which he reaffirmed his prior repudiation of the contracts' enforceability, but nevertheless stated his intention to perform if the contracts were deemed enforceable, constituted adequate assurance. The court held, therefore, that the coop had breached the contracts by cancelling them after adequate assurance had been given. Accordingly, it entered judgment for Hanig.

In ruling on the coop's post-trial motion, the court rejected the coop's argument that Hanig's July 19, 1996 letter continued his earlier repudiation of the contracts. The court reasoned that Hanig stated·he would perform if the contracts were determined to be enforceable and, because delivery was not required for five months, Hanig had an opportunity within that time frame to obtain a judicial determination of the contracts' enforceability. The court noted that the coop's cancellation of the contracts deprived Hanig of this opportunity.

The coop filed this appeal raising two issues. First, the coop claims that the trial court erred in determining that Hanig's letter of July 19, 1996 provided adequate assurances of performance. Alternatively, the coop asserts that the trial court should have ruled· that Hanig repudiated the contracts in his June 18, 1996 letter and never withdrew his repudiation. We find it necessary to address only the first issue.

eral modification: (1) charging the spread to · him in the rolled contracts; and (2) the perceived restriction on future rolling. The trial court found that the parties' course of dealing established that the spread would be reflected in the contract price under any rolled' contracts, and that the coop had never denied Hanig any requested roll. In addition, the contracts calling for December 1996 delivery, which the coop asked Hanig to sign, did not place any restriction on rolling. In it's ruling, the trial court held that these contracts were

## II. Scope of Review.

This breach of contract action was tried at law and therefore our review is for correction of errors of law. See Iowa R.App. P. 4; *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 689 (Iowa 1999). Whether the assurances offered by a party are adequate is normally a factual question. See *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568 (10th Cir.1989). The trial court's findings of fact have the effect of a special verdict and are binding if supported by substantial evidence. See *Van Oort*, 599 N.W.2d at 689. "Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion." *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995). "We view the evidence in a light most favorable to· the trial court's judgment." *Van Oort*, 599 N.W.2d at 689.

As contrasted to the trial court's factual findings, the district court's legal conclusions and application of legal principles are not binding on the appellate court. See *Hodges v. Hodges*, 572 N.W.2d 549, 551 (Iowa 1997). If "the trial court has applied erroneous rules of law [that] materially affected its decision," we must reverse on appeal. *Falczynski*, 533 N.W.2d at 230.

## III. Did the Trial Court Err When it Concluded That Hanig's Letter of July 19, 1996, Constituted Adequate Assurance of Performance?

The contracts at issue in this case are governed by article 2 of the Iowa Uniform

"valid." Inherent in this conclusion is a rejection of Hanig's contention that the contracts had been unilaterally modified in breach of the parties' prior agreements. In other words, if the new contracts were an ·unreasonable modification of the parties' prior agreements, they could not logically at the same time be "valid." We find no basis to reverse the trial court's conclusion with respect to the validity of the new contracts that Hanig was requested to sign. The court applied correct principles of law and there is

Commercial Code. *See Top of Iowa Coop.*, 608 N.W.2d at 466. "Under the U.C.C., a party to a contract who has reasonable grounds to believe that the other party will be unwilling or unable to perform his contractual obligation may require the party to provide adequate assurance of performance." *Id.* at 466 (citing Iowa Code § 554.2609 (1995)). A party receiving a justified demand for assurances has a reasonable time, not exceeding thirty days, to provide assurance. *See* Iowa Code § 554.2609(4) (1995). A failure to provide adequate assurances within that time frame is deemed a repudiation of the contract. *See id.;* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6–2, at 294 (4th ed. 1995) ("A fourth type of repudiation occurs when a party fails to give adequate assurances of performance when required to do so under section 2–609(4)."); Larry T. Garvin, *Adequate Assurance of Performance: Of Risk, Duress, and Cognition,* 69 U. Colo. L.Rev. 71, 71 (1998) ("[I]f the demand is answered unsatisfactorily, the insecure party may hold the other in breach."). The nature of adequate assurance is summarized in a comment to section 554.2609:

> The section rests on the recognition of the fact that the essential purpose of a contract between commercial men is *actual performance* and they do not bargain merely for a promise, or for a promise *plus the right to win a lawsuit* and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.

Iowa Code Ann. § 554.2609, cmt. 1 (emphasis added).[2]

■ We conclude that no reasonable fact finder could find that the assurance provided by Hanig was adequate under this standard. Hanig did not promise performance; he promised performance only if the contracts were determined to be enforceable. Paraphrasing the quoted comment to section 554.2609, Hanig did not promise "actual performance"; he merely offered his promise "plus the right to win a lawsuit."

In addition, under the conditions set forth in Hanig's July 19, 1996 letter, the coop would not be assured that performance would be forthcoming when due until Hanig obtained a judicial determination that the contracts were enforceable. It would have been a practical impossibility for such a determination to be made within the thirty days allowed by section 554.2609(4), i.e., by August 12, 1996. Consistent with the principles of law set forth above, any assurance provided beyond the thirty-day period is automatically inadequate. *See* Iowa Code Ann. § 554.2609, cmt. 5 ("The thirty day limit on the time to provide adequate assurance is laid down to free the question of reasonable time from uncertainty in later litigation.").

■ Finally, Hanig's assurances were inadequate for the additional reason that his performance was conditioned on a requirement—a judicial determination of enforceability—not within the terms of the contracts. Under the U.C.C., when a party states its intention not to perform "except on conditions which go beyond the

substantial evidence to support its factual findings with respect to this issue.

2. This comment refers to "commercial men." The coop argues that Hanig was a merchant so as to trigger the applicability of section 554.2609(2): "Between merchants ... the adequacy of any assurance offered shall be determined according to *commercial* standards." (Emphasis added.) The trial court made no finding on whether Hanig was a merchant. *See* Iowa Code § 554.2104(1) (defining "merchant"). We do not address this issue because we conclude that Hanig's assurances were unreasonable as a matter of law without specific reliance on any particular commercial standard or practice. Although the quoted comment 1 refers to "commercial men," we have no doubt that the ordinary person who does not qualify as a merchant also recognizes that a grain dealer in these circumstances bargains for actual performance and not a lawsuit. *See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6–2, at 289 (4th ed.1995) (suggesting that courts use common sense in determining whether assurances given are adequate).

contract," the party's statement constitutes a repudiation of the contract. Iowa Code Ann. § 554.2610, cmt. 2.[3] That is exactly what happened here. Hanig stated unequivocally that he would not deliver the grain as required by the contracts *unless* the contracts were determined to be enforceable, a condition not found in the contracts. When a party's "assurances" constitute a repudiation, they cannot, as a matter of law, qualify as *adequate* assurances. *See Kaiser–Francis Oil Co.*, 870 F.2d at 569 (holding, as a matter of law, that conditioning performance on agreement to contract modification was an inadequate assurance); *Aero Consulting Corp. v. Cessna Aircraft Co.*, 867 F.Supp. 1480, 1491 (D.Kan.1994) (holding, as a matter of law, that party's refusal to perform unless other party agreed to a condition that was not a part of the contract constituted a repudiation); *Louisiana Power & Light Co. v. Allegheny Ludlum Indus., Inc.*, 517 F.Supp. 1319, 1323 (E.D.La.1981) (holding, as a matter of law, that party's qualified promise of performance did not constitute adequate assurance of performance); *Copylease Corp. v. Memorex Corp.*, 403 F.Supp. 625, 631 (S.D.N.Y.1975) (holding that party's demand that insecure party agree to modification of the contract did not constitute reasonable assurance of performance). We conclude that the trial court erred in holding otherwise.

IV. *Summary and Disposition.*

The trial court erred as a matter of law in finding that Hanig's July 19, 1996 letter constituted adequate assurance of performance. Accordingly, Hanig breached the contracts by failing to provide adequate assurances within thirty days of the coop's demand for such assurances. Therefore, we reverse the trial court's judgment and remand this case for entry of judgment in favor of Land O'Lakes. Upon remand, the trial court shall determine the damages to which Land O'Lakes is entitled on the record previously made, and shall enter judgment for that amount, plus costs and interest.

**REVERSED AND REMANDED.**

All justices concur except LAVORATO, J., who takes no part.

---

3. The present situation is to be distinguished from an *insecure* party's ability to demand reasonable assurance in the form of performance not required by the contract. Such a demand does not constitute a repudiation of the contract. *See Top of Iowa Coop.*, 608 N.W.2d at 460. Here, in contrast, Hanig was not the insecure party and, therefore, had no right to demand performance beyond the contract terms.