# IN THE COURT OF APPEALS OF IOWA

No. 13-0758
Filed May 29, 2014


**PORTZEN CONSTRUCTION, INC.,**
     Plaintiff-Appellee,

**vs.**

**CAL-CO INSULATION, INC.,**
     Defendant-Appellant.

------------------------------------

**CAL-CO INSULATION, INC.,**
     Plaintiff-Appellant,

**vs.**

**PORTZEN CONSTRUCTION, INC., and
UNITED FIRE & CASUALTY COMPANY,**
     Defendant-Appellees.
_____

     Appeal from the Iowa District Court for Dubuque County, Thomas A.

Bitter, Judge.

     A subcontractor appeals from the judgment entered by the district court in

favor of a general contractor. **AFFIRMED.**

     Todd J. Locher of Locher & Locher, PLC, Farley, for appellant.

     Douglas M. Henry of Fuerste, Carew, Juergens & Sudemeier, P.C.,

Dubuque, for appellee Portzen.

     Drew J. Gentsch of Whitfield & Eddy, P.L.C., Des Moines, for appellee

United Fire.

     Heard by Doyle, P.J., Tabor, J., and Zimmer, S.J.*

     *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**DOYLE, J.**

Cal-Co Insulation, Inc., a subcontractor on a commercial building renovation project, appeals from the judgment entered by the district court in favor of general contractor Portzen Construction, Inc. on the parties' respective breach-of-contract claims and the discharge of the bond posted by United Fire & Casualty Company. We affirm.

## I.    *Background Facts and Proceedings*

In early 2011, Gronen Restoration, Inc. began accepting bids for a number of construction contracts associated with a renovation project of the Caradco building in Dubuque. Portzen Construction, Inc. prepared a bid for the contract entitled "Concrete Flooring Systems"—a flooring portion of the project that included installation of insulation in places, a layer of noise-retardant material, and new concrete poured over the top. As part of its bid, Portzen wanted to offer Gronen the option of either "rigid board" insulation or "spray foam" insulation.

To provide the spray foam insulation option, Portzen contacted Cal-Co Insulation, Inc. to request a subcontractor bid. Portzen told Cal-Co the second floor would require 633 cubic yards of insulation and the third floor would require 720 cubic yards of insulation.[1] Cal-Co stated it would need to calculate its numbers. Cal-Co called back later that day and told Portzen its cost would be $14,185 to spray the second floor and $16,135 to spray the third floor, for a total of $30,320.

---

[1] To prepare the estimate of the amount of product that would be needed, Portzen owner Michael Portzen calculated the volume of the area to be insulated by using more than 400 different elevation points on each floor.

The next day, June 2, 2011, Cal-Co met with Portzen at Portzen's office. Portzen showed Cal-Co the project plans, and emphasized that the floors of the Caradco building were uneven and the layer of insulation would vary between one inch and ten inches. Portzen also told Cal-Co the job would need to be done in stages, meaning Cal-Co would have to do sections of the insulation rather than complete the insulation at one time. After some discussion, Cal-Co stated the extra "mobilizations" would add an additional $1000 to its bid. Portzen therefore considered Cal-Co's bid to be an even $32,000.

Portzen submitted its bid to Gronen later that day. Relying on Cal-Co's subcontractor bid, Portzen's bid included the option to "use spray foam in lieu of board insulation" for a $265,000 deduction in cost. Gronen accepted Portzen's bid with the spray foam insulation option and a contract between Gronen and Portzen was signed. An agreement between Portzen and Cal-Co was drafted but was not signed.

On June 13, Cal-Co sprayed a test section (approximately ten feet by ten feet) with spray foam insulation. Cal-Co billed Portzen $840 for the test section.

On September 1, Cal-Co sprayed an entire apartment of the building (apartment 222) as another test section. Cal-Co billed Portzen $5268 for the spraying on apartment 222.

Around that time, Cal-Co became concerned the job was going to require far more spray foam insulation than it had originally determined. Cal-Co contacted its spray foam insulation supplier in an attempt to get a better price on the insulation. Cal-Co and the supplier discussed the job site measurements. The supplier calculated the total quantity of insulation Cal-Co needed for the job

to be between 106 and 125 "sets" of insulation,[2] priced at approximately $1950 per set—for a total product cost of $206,700 to $243,750.

Cal-Co contacted Portzen regarding the fact that the job was going to require more than $200,000 in product alone. To prevent the project from coming to a standstill, Portzen asked Cal-Co to spray a section of the building (approximately 5000 square feet) to buy some time to find a solution to the problem. Between September 23 and September 28, Cal-Co sprayed 5160 square feet, for which it billed Portzen $10,986.

Meanwhile, Portzen met with Gronen to discuss miscalculation of cost for the spray foam insulation portion of the project. Ultimately, Gronen hired Noonan Insulation to finish the insulation job. Bel-Aire Home Improvements also completed a small portion of the insulation. Portzen lost a total of $303,000 as a result of Cal-Co not completing the insulation as originally planned.

Portzen filed a petition at law claiming Cal-Co breached its contract with Portzen and seeking damages in the amount the actual cost of completion of the insulation "exceeded the agreed price of $32,000," plus interest and costs. Meanwhile, Cal-Co filed an action in equity against Portzen and its bonding company, United Fire & Casualty Company, seeking recovery on its mechanic's lien in the amount of $18,837 that Portzen discharged, for work completed by Cal-Co that had not been paid by Portzen. The district court stayed Cal-Co's equity action pending the outcome of Portzen's law action.

---

[2] Each set of spray foam insulation is approximately 1000 pounds and covers about 4500 board feet. Witnesses at trial testified a "board foot" is a unit of measurement twelve inches by twelve inches by one inch.

Following a bench trial, the district court determined a contract existed between the parties and entered judgment in favor of Portzen on its breach-of-contract claim. The court found, "Cal-Co had enough information to properly bid the job. Cal-Co simply made a mistake." The court further determined, "Portzen acted to its detriment in reliance on [Cal-Co's] promise. Substantial injustice would result if the promise is not enforced." The district court awarded Portzen $303,000 in damages. The court also ordered Portzen to pay Cal-Co $1743 for work it performed but was not paid for on a different part of the Caradco building.

Cal-Co filed a motion to enlarge, and Portzen filed a motion to provide for payment and a motion to discharge bond. Following a hearing, the court entered an order (1) denying Cal-Co's motion, (2) specifying the terms of payment to satisfy the parties' respective judgments, and (3) discharging the bond posted by United. Cal-Co now appeals.[3,4]

---

[3] United, as appellee, joins the arguments made by Portzen on appeal. Insofar as United alternatively claims Cal-Co waived any claims against United by not specifically discussing "United," we believe Cal-Co's claims appropriately incorporate United and address them as such.

[4] Inexplicably, the parties failed to include any part of the trial transcript in their appendix, even though portions of the transcript were referenced frequently in their briefs. Iowa Rule of Appellate Procedure 6.905(2)(b)(3) prescribes the appendix "shall contain" relevant portions of the transcript. There is a reason for the rule. Non-electronic district court files are easily accessible to those judges who office in the Judicial Branch Building, but these materials are not readily available to those judges who office outside of Des Moines. Including relevant portions of the transcript in the appendix makes that critical material readily and equally accessible to all judges on the panel considering the appeal—whether they office in Des Moines or elsewhere. This court's mandate is to justly decide a high volume of appeals. *See* Iowa Ct. R. 21.12. Parties' compliance with appellate rules of procedure promotes judicial efficiency, thus aiding this court in doing its work to meet that mandate. With full implementation of EDMS and electronic appellate filing, the appendix may well go the way of the dinosaur. But until then, parties' compliance with current rules governing the preparation of appendices is imperative.

## II.      *Standard of Review*

We review a breach of contract action for correction of errors at law. *Iowa Mortgage Ctr.*, *L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013); *see* Iowa R. App. P. 6.907. "If substantial evidence in the record supports a district court's finding of fact, we are bound by its finding." *Iowa Mortgage*, 841 N.W.2d at 110. The district court's legal conclusions and application of legal principles, however, are not binding on the appellate court. *See id.* If the district court has applied erroneous rules of law that materially affected its decision, we must reverse on appeal. *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000).

We also review a claim for damages arising from the construction of a building for error of law. *Serv. Unlimited, Inc. v. Elder*, 542 N.W.2d 855, 857 (Iowa Ct. App. 1995). Again, the findings of the district court are binding on us if supported by substantial evidence. *See id.*

## III.      *Timeliness of Appeal*

Portzen contends Cal-Co's notice of appeal was untimely. Portzen asserts the post-judgment motion filed by Cal-Co amounted to nothing more than a rehash of legal issues and, as a result, it was not a valid rule 1.904(2) motion and did not toll the time for appeal. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668-69 (Iowa 2013) ("When a rule 1.904(2) motion amounts to nothing more than a rehash of legal issues previously raised, we will conclude the motion does not toll the time for appeal."). Cal-Co responds by claiming its rule 1.904(2) motion did not simply rehash legal issues. Cal-Co points out that its motion asked the court to amend its factual findings concerning the amount of work, and at what price, Cal-Co agreed to provide. Cal-Co further points out that its motion

took issue with the court's findings regarding Portzen's damages. Upon review of the record, we conclude Cal-Co's motion was not merely a rehash of legal issues and accordingly, it tolled the time for appeal. *See* Iowa Rs. App. P. 1.904(2); 6.101(1)(b). We proceed to the merits of the appeal.

## IV. *Sufficiency of Evidence to Prove the Existence of an Oral Contract*

Cal-Co contends the district court erred in finding there was sufficient evidence of an oral contract between Cal-Co and Portzen for Cal-Co to provide 633 cubic yards of spray foam insulation for $14,185 and 720 cubic yards of spray foam insulation for $16,135. Portzen counters that the evidence presented at trial was sufficient to support the district court's judgment.

The existence of an oral contract, as well as its terms and whether it was breached, are ordinarily questions for the trier of fact. *Dallenbach v. Mapco Gas Prod., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990). To prove the existence of an oral contract, the proponent must show the terms are "sufficiently definite for a court to determine with certainty the duties of each party, the conditions relative to performance, and a reasonably certain basis for a remedy." *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998). Where a contract appears to exist, courts are reluctant to find it too uncertain to be enforceable. *Audus v. Sabre Commc'ns Corp.*, 554 N.W.2d 868, 872 (Iowa 1996). Accordingly, the question here is whether the terms of the communications between Cal-Co and Portzen were definite enough to form a contract.

From the testimony at trial, the district court heard vastly different accounts of the interactions that took place between Cal-Co and Portzen during

the relevant two-day time period during which an agreement between the parties was apparently reached. For instance, Ross Pierce, president of Cal-Co, unequivocally denied ever going to Portzen's office on June 2 to review the job plans. Pierce also testified he did not remember "receiving a total cubic yard number" from Portzen, and to the contrary, stated he had provided Portzen with Cal-Co's board-foot "rate" and allowed Portzen to calculate the total numbers.

In reaching its factual findings, the district court relied on the testimony of Portzen estimators Ben Mumm, Andrew Noble, and Michael Portzen, which contradicted the testimony of Pierce. The court found Portzen provided information about the job to Cal-Co (including, significantly, that the second floor would require 633 cubic yards of insulation and the third floor would require 720 cubic yards of insulation), Cal-Co calculated its numbers, and Cal-Co informed Portzen it would cost a total of $30,320 to spray the two floors. The district court also found Pierce met at Portzen's office to review the plans and at that time, stated Cal-Co would need an additional $1000 for the extra "mobilizations"[5] required for the job. Using the numbers provided by Pierce ($30,320 + $1000), Portzen then submitted its bid to Gronen, which included an option for using Cal-Co's spray foam insulation for $32,000. Portzen subsequently mailed a subcontract agreement to Cal-Co setting forth a price of $32,000 for the work to be performed. Cal-Co did not respond to the agreement, but performed work on the Caradco building for Portzen shortly thereafter.

Cal-Co's claim focuses on the factual discrepancies in the record on this issue. Our role as the reviewing court is not, however, to dissect the record

---

[5] *I.e.*, trips to the job-site.

anew to reach our own factual findings. Rather, the district court's findings of fact have the effect of a special verdict and are binding upon us if supported by substantial evidence. Iowa Rs. App. P. 6.904(3)(a); 6.907. Evidence is substantial where a reasonable mind would accept it as adequate to reach a conclusion. *Land O'Lakes*, 610 N.W.2d at 522. In determining whether substantial evidence supports the trial court's judgment, we view the evidence in the light most favorable to judgment. *Id.*

In reaching its findings, the district court stated:

> . . . Ross Pierce was told the correct volume (cubic yards) of insulation needed. He was specifically advised by his provider that he should bid the job in board feet, not cubic yards and that he should go to the job site personally to measure the job. Michael Portzen used many different elevation points and calculated precisely the volume of insulation needed for the project. Cal-Co had enough information to properly bid the job. Cal-Co simply made a mistake.
> . . . .
> There was a clear and definite promise between the parties. The promise was made with Cal-Co's clear understanding that Portzen was seeking an assurance on which Portzen could rely. Portzen acted to its detriment in reliance on that promise. Substantial injustice would result if the promise is not enforced.

We conclude substantial evidence supports the district court's findings. There is no question under this record that the parties discussed the job plans, contemplated the measurements and scope of the project, and agreed upon a definite amount for which Cal-Co would be compensated for completing the job. "In order to find that an oral contract existed, there must be sufficient evidence of its terms to ascertain the duties and conditions established." *Audus*, 554 N.W.2d at 871. We affirm on this issue.

## V. Duty of Further Inquiry

Cal-Co contends even assuming, arguendo, Cal-Co quoted a price of $30,320 for spray foam insulation, "the quote would have been too good to be true, triggering Portzen's duty to make inquiry concerning the accuracy of the quote." Cal-Co points out its bid was $300,000 less than the lowest bid for rigid board insulation (the other insulation option Portzen included in its bid to Gronen), but "no one at Portzen thought to investigate the vast discrepancy." According to Cal-Co, "Portzen should bear the brunt of its mistake."

Cal-Co relies on authority from other jurisdictions and general contract principles to support its proposition that Portzen had a duty to investigate an offer too good to be true. *See, e.g.*, *Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985) ("A duty to inquire may be imposed on the person receiving the offer when there are factors that reasonably raise a presumption of error. An offeree will not be permitted to snap up an offer that is too good to be true . . . .") (internal citation and quotation marks omitted) (citing 1 *Williston on Contracts* § 94 (3d ed. 1957)). Portzen counters that any duty to inquire was not triggered under these circumstances. Portzen points to the fact that the district court made factual findings Portzen did not know or should not have known Cal-Co's bid was too good to be true.

Again, the district court's findings of fact have the effect of a special verdict and are binding upon us if supported by substantial evidence. Iowa Rs. App. P. 6.904(3)(a); 6.907.

> Clearly, there was no fraudulent conduct on the part of Portzen. The fighting factual issue seems to be whether Portzen knew, or reasonably should have known, that Cal-Co's bid was so

low as to make that bid "too good to be true." Both parties have legitimate arguments to support their position and the issue is a close call. The difference between the Cal-Co spray foam bid and the next lowest bid is extreme. The Cal-Co bid was only 10% of the next lowest bid. However, only the Cal-Co bid involved spray foam insulation. All of the other bids involved rigid (traditional Styrofoam) insulation. Portzen had essentially no prior experience with spray foam insulation. There is nothing to suggest that Portzen had ever applied spray foam insulation or that Portzen knew anything about the pricing of spray foam insulation. Ross Pierce had been in the business of measuring and pricing jobs for years. He had been applying spray foam insulation since 2004. He had attended a four-day course specifically pertaining to spray foam insulation. He has access to his sales rep, and he has dealt with that same rep for five years. The Court cannot find that Portzen knew or reasonably should have known that the bid was "too good to be true."

We conclude substantial evidence supports the district court's findings. It is apparent Portzen had no prior experience using spray foam insulation and Portzen contacted only one spray foam insulation provider (Cal-Co) in collecting bids to provide an alternative for spray foam insulation. Cal-Co was a local company and an experienced spray foam insulation provider. Michael Portzen testified he believed rigid insulation work was "a lot more labor intensive" than spray foam insulation work. Like the district court, we cannot find that Portzen knew or reasonably should have known Cal-Co's bid was too good to be true.

## VI.  *Damages*

Cal-Co contends the district court's award of damages to Portzen was improper because the court failed to reduce the award by $185,000 due to the price adjustment Gronen made on its contract with Portzen after the pricing error of the spray foam insulation bid by Cal-Co was discovered. Cal-Co further claims the court erred in offsetting Portzen's damage award by $18,837 for work Cal-Co performed that "remains unpaid." Although Cal-Co sets forth these claims in

separate sections of its brief, we will address them collectively because they implicate the proper amount of damages in this case.

The purpose of awarding damages in a breach of contract action is to place the injured party in the position it would have occupied if the contract had been performed. *Flom v. Stahly*, 569 N.W.2d 135, 142 (Iowa 1997).

> Damages for breach of contract are limited to those injuries which may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as a probable result of the breach.

*R.E.T. Corp. v. Frank Paxton Co., Inc.*, 329 N.W.2d 416, 420 (Iowa 1983).

Here, Portzen was entitled to recover the damages it incurred to complete the contract following Cal-Co's discharge from the project to the extent that completion costs exceed the unpaid balance of the contract price. *See* 6 Philip L. Bruner and Patrick J. O'Connor, *Bruner & O'Connor On Construction Law* § 19:78 (July 2013) ("Damages incurred to complete the contract following the owner's just termination of the contract for default or the contractor's wrongful repudiation of the contract or wrongful abandonment of the project, are recoverable to the extent that completion costs exceed the unpaid balance of the contract price. The damage measure is the reasonable cost to complete the contract in conformance with its terms, less unpaid contract funds."); 22 Am.Jur.2d *Damages* § 83, at 118-19 (1965) ("[A] contractor that performed defective work for a premises owner was entitled to recover breach-of-contract damages in the amount of the remaining contract price less the premises owner's cost to complete or repair the contractor's work. However, if the cost to complete or repair exceeds the remaining contract price, the premises owner is entitled to

judgment for the excess."); *see also Kieffer v. Farrell*, No. 10-1277, 2011 WL 2696392, at *2-3 (Iowa Ct. App. July 13, 2011) (holding after the owner had given the contractor a reasonable opportunity to complete the work and repair deficiencies, the owner could take over the work and offset against the contract balance the sums incurred in doing so).

The district court determined Portzen suffered damages in the amount of $303,000 as a result of Cal-Co's breach. The district court relied on exhibits submitted by Portzen and the testimony of Michael Portzen and Portzen's controller, Jayme Kluesner, to reach its conclusion. Specifically, Portzen submitted into evidence an exhibit prepared by Kluesner entitled "Calculation of Damages," indicating the invoices paid to Noonan Insulation and Bel-Aire Home Improvement by Portzen totaled $362,328.86. Cal-Co's bid price of $32,000 was deducted from that number, resulting in $330,328.86 in damages. Kluesner testified he then pro-rated the damage award from $330,328.28 to $303,000 to account for 126 sets of insulation rather than 136 sets of insulation—in order to match the amount of insulation Cal-Co agreed to spray.[6]

With regard to Cal-Co's claim concerning the pricing adjustment addendum that was incorporated into the signed contract between Portzen and Gronen indicating Noonan Insulation would finish the insulation job and Gronen would pay an additional $185,000 to Portzen, we believe the district court properly determined Portzen was entitled to recover the full $303,000 in damages without accounting for the price adjustment made by Gronen. To account for the unexpected extra cost of the insulation portion of the project,

---

[6] The project ultimately required ten additional sets.

Portzen discounted the services it provided to Gronen. Michael Portzen testified the $185,000 was absorbed by Portzen through deductions and credits given on the project at issue coupled with Portzen's other contracts with Gronen on the Caradco building. As Michael Portzen testified:

> Q. What happened with the $185,000 that Gronen agreed to pay you as an addition? Where did that go? A. That's—well, $55,000 of it got saved by our costs on the concrete job. Another $130,000 is going to come off our mechanical contract.
> Q. So those are funds that, in fact, Gronen is not going to pay you? A. Yes.

While the evidence is not crystal clear, we nevertheless believe substantial evidence supports the court's finding that Portzen's damage award should not be reduced by $185,000.

With regard to Cal-Co's claim that Portzen's damage award should be offset by $18,837 for work Cal-Co performed that "remains unpaid," we believe the damage calculation submitted by Portzen essentially included a credit of $32,000 to Cal-Co for work it performed (and did not perform) under its contract. "The purpose of a damage suit is compensation; the goal is to place the injured party in as favorable position as though no wrong had occurred. Damages are limited to the actual loss." *R.E.T. Corp.*, 329 N.W.2d at 421.

In this situation, Portzen's damages would be the cost of completion, reduced by the amount outstanding on the contract with Cal-Co. *See* 6 *Bruner & O'Connor Construction Law* §§ 19:77, 19:78. Even though Cal-Co only performed work in the amount of $17,094,[7] based on Portzen's damage

---

[7] Cal-Co persists it is owed $18,837, but Cal-Co fails to mention the district court entered judgment against Portzen in the amount of $1743 to compensate Cal-Co for its work on a portion of the project unrelated to the instant contract ($18,837+$1743=$17,094).

calculation sheet, Cal-Co received a credit for its entire bid of $32,000. We conclude the district court properly awarded damages to Portzen.

### VII.  *Conclusion*

We have considered all issues presented on appeal and conclude the judgment of the district court should be affirmed.

**AFFIRMED.**