# IN THE COURT OF APPEALS OF IOWA

No. 18-0204
Filed March 6, 2019

**FLIX BREWHOUSE IOWA, LLC,**
　　Plaintiff-Appellee,

**vs.**

**MERLE HAY MALL, L.P.,**
　　Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.

Merle Hay Mall appeals a district court ruling finding an enforceable settlement agreement existed between Merle Hay Mall and Flix Brewhouse Iowa. **AFFIRMED.**

Sarah K. Franklin and Elizabeth R. Meyer of Davis Brown Law Firm, Des Moines, for appellant.

William B. Serangeli of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

Heard by Potterfield, P.J., and Tabor and Mullins, JJ.

**MULLINS, Judge.**

Merle Hay Mall, L.P. (MHM), appeals a district court ruling finding an enforceable settlement agreement between MHM and Flix Brewhouse Iowa, LLC (Flix). MHM claims the parties did not reach an agreement on the meaning of the contract terms in the settlement agreement, so no contract existed. We find an enforceable settlement agreement existed and affirm the district court.

## I.      Background Facts and Proceedings

On April 4 and May 9, 2013, Flix, as tenant, and MHM, as landlord, entered into a lease agreement. The lease was negotiated by Elizabeth Holland as CEO and general counsel for MHM's management company, Allan Reagan as president of one of Flix's management companies, and Matt Silvers as general counsel for Flix. Holland drafted the lease agreement. The lease covered 37,000 square feet of space located in Merle Hay Mall. Flix tendered a $1.5 million security deposit.[1] MHM spent $12.8 million renovating the property to create appropriate space for the theater and microbrewery—$5.3 million more than originally budgeted.

Article 36 of the lease established a landlord's lien and security interest on Flix's personal property. The relevant portions of Article 36 state:

> As further security for Tenant's performance under this Lease, to the extent not expressly prohibited by applicable Law, Subject to the provisions set forth in Article 7, Paragraph D, Tenant hereby grants Landlord a lien and security interest in all tangible personal property existing and after-acquired property of Tenant placed in or relating to Tenant's business at the Premises, including but not limited to, insurance proceeds from casualty losses to personal property, fixtures, equipment, inventory, furnishings and other

---

[1] The contract provided $500,000 of the security deposit would be released when Flix opened for business and paid its first month of rent, another $500,000 would be released at the end of the first full lease year, and the final $500,000 at the end of the second full lease year unless Flix had an ongoing default.

tangible personal property. . . . Tenant agrees to execute such financing statements, collateral assignment of rents and subleases, and other documents necessary to perfect a security interest, as Landlord may now or hereafter reasonably request in recordable form. Landlord may at its election at any time execute such a financing statement and collateral assignment as Tenant's agent and attorney-in-fact or file a copy of this Lease as such financing statement and collateral assignment. Landlord shall be entitled hereunder to all of the rights and remedies afforded a secured party under the Uniform Commercial Code or other applicable Law in addition to any landlord's lien and rights provided by applicable Law.

Provided that Tenant is not then in default of this Lease beyond any applicable cure period, Landlord following twenty four months (24) of continuous operation by Tenant agrees to execute a commercially reasonable subordination of its lien on Tenant's property to the lien of any bona-fide third-party lender to Tenant providing financing of furniture, fixtures and equipment and other removable personalty located at the Premises. In addition, subsequent to the 84th month of the Term, upon Tenant's written request, Landlord agrees to release its lien rights over Tenant's personalty provided that the Lease is then in good standing and Tenant is open for business and occupying the Premises for its Permitted Use.

On September 30, 2014, Flix signed a financing lease agreement for personal property relating to food and drink service with GB Leasing, Inc. (GBL).[2] The lease agreement granted GBL a security interest in the fixtures, furniture, and equipment obtained through the lease. Flix opened for business in December 2014. In February 2015, MHM discovered the GBL lease. The parties did not agree on the impact of the GBL lease on MHM's lien subordination rights: MHM claimed the GBL lease constituted a default under Article 36 of the MHM-Flix lease and GBL was not a bona-fide third-party lender; Flix asserted Article 36 only

---

[2] A finance lease is essentially a lease-to-own arrangement, where the lessor finances the asset and the lessee pays all other costs and has the option of purchasing the asset at the end of the lease for a nominal price. *See Lease*, Black's Law Dictionary (10th ed. 2014).

applied to property Flix owned or had an interest in. MHM states it believed the above language made it Flix's lender and considered it a blanket lien over all of Flix's tangible personal property purchased or leased. MHM argued the provision effectively prohibited finance lease agreements, but Flix did not hold a similar understanding.

On March 6, MHM filed a financing statement. On September 2, MHM sent a letter asserting Flix had defaulted under the lease for failure of GBL to subordinate its lien rights to MHM's rights. Flix responded and denied default, contending the lease did not limit or prohibit the leasing of equipment, which is a standard practice in the restaurant and cinema industries.

Flix sent MHM a notice-of-right-to-cure letter on January 13, 2016, requesting release of the first $500,000 of the security deposit which should have been released on February 1, 2015, if Flix was not in default. MHM did not respond. On February 15, Flix sent a notice of default to MHM for its refusal to release the first $500,000. Flix also sent a notice of right to cure to MHM for the second $500,000 which should have been released on February 1, 2016. Citing Article 36's default provision, MHM refused to release the $1 million from Flix's security deposit.

On April 11, the parties agreed to enter negotiations in an attempt to resolve their differences. Holland represented MHM, and Flix was represented by Joseph Borg. On April 27, Borg emailed a settlement proposal to Holland. Holland had not responded by May 4, so Borg resent the proposal. Holland replied that she had not received the initial email and would address the proposal the next week; further communication resulted in a conference call on May 11.

The proposed settlement agreement provided Flix would terminate the GBL lease and listed assets which only MHM held a lien on. MHM would execute the joint order to release the disputed security deposit funds from the escrow agent and agree to execute an attached subordination agreement. The subordination agreement provided MHM would subordinate its lien to GBL beginning December 17, 2016.

On the May 11 call, Holland stated MHM would agree to subordinate its interest in Flix collateral after February 1, 2017, if Flix replaced GBL with a bona-fide third-party lender or provided proof GBL was a true bona-fide third-party lender. Holland testified during the call she explained her understanding of Article 36 to be that Flix could only finance after-acquired property after twenty-four months of compliance with the lease—MHM had a full lien for the first twenty-four months, then a step-down, and a release after eighty-four months. Borg understood from the call MHM would not subordinate until February 1 and all discussions of the provision were in the context of the GBL lease. The next day, Holland emailed Borg stating MHM only required two things to move forward to resolution: a subordination from GBL to MHM through February 1, 2017, and information sufficient to determine GBL was a bona-fide third-party lender.

Borg sent a second settlement proposal on May 27, 2016. His email stated "any subordination after February 1, 2017, would be to a 'bona-fide third-party lender' as per the terms of the Shopping Center Lease." The settlement and subordination agreements were amended as requested in Holland's email: moving the subordination date to February 1, 2017, limiting MHM's subordination to a bona-fide third-party lender, changing the bona-fide third-party lien to "all assets

owned by Flix" in place of an identified list of assets, and substituting GBL with an unnamed secured party in the subordination agreement. Borg resent the proposal on June 3, and received a reply from Holland that MHM was awaiting comments from local counsel and would then set up a time to discuss.

Borg followed up on June 16, and Holland responded she was waiting for answers to a list of questions sent to MHM counsel that week. Borg and Holland spoke by telephone on June 17; Holland was fine with the changes made and indicated if GBL remained a secured creditor, MHM would require GBL to acknowledge its lien rights were subordinate to MHM.

Borg sent a third proposed agreement on July 1 reflecting his understanding of Holland's requested changes. This version included a subordination agreement with GBL subordinating its interests to MHM's primary lien. The proposal was sent again on July 13, at which point Holland asked for a Word version so she could compare it to a document drafted by her Iowa counsel. Borg provided the requested document on July 14, describing the proposed GBL subordination agreement as a standard subordination agreement following the language of the lease and noting the subordination agreement previously proposed by MHM was inapplicable due to the expected termination of the Flix-GBL lease.

On August 2, in response to a status check by Borg, Holland emailed Borg stating:

> Our Iowa Counsel has reviewed the document and we will agree that provided nothing in our agreement will in any way be construed as an agreement that GB Leasing is in fact an arms length third party, we can agree to it. Until we are provided with this assurance, we will require this proviso.

Borg added a provision reflecting Holland's request on August 3, creating the fourth settlement proposal, which Holland said "looks good."

Following Holland's statements MHM agreed to the document, Flix began to take steps to comply with its obligations under the settlement agreement. Flix reached out to GBL and on September 6, GBL agreed to let Flix buy out the lease agreement with a penalty payment of $15,000. Flix purchased the equipment from GBL through the use of promissory notes.

On October 6, Holland emailed Borg asking if the revisions were acceptable to Flix. She stated, "Please let me know if they are and we can move forward to execute this document. If it is acceptable, please have Flix execute it and we will sign second." On October 13, Flix and GBL "accepted and executed the agreement."

On October 31, one of Holland's associates contacted Borg about extending the letter of credit for the final $500,000 of the security deposit, which was set to expire on November 6. Borg testified the associate indicated the settlement documents were fine, and Flix extended the letter of credit. Borg reached out to Holland on November 16 for a status update on the settlement documents. Holland responded and copied her associate asking if the letter of credit had been extended and stated, "My understanding was that was what we were waiting for."

On December 12, four months after approving the document and nearly two months after stating if Flix executed the agreement MHM would sign second, Holland left Borg a voicemail message stating the settlement agreement did not make clear MHM's lien subordination would be limited to after-acquired property.

She requested language be inserted in the agreement clarifying that. Borg did not respond.

On December 13, William Serangeli, additional counsel for Flix, sent an email to Holland demanding receipt of the executed settlement agreement. Holland executed the Exhibit 4 of the agreement—a joint order for the release of $1 million of the security deposit held in escrow—and forwarded it to the escrow agent, who released the funds to Flix. No other portion of the settlement agreement was returned to Flix executed by MHM.

On December 22, Flix filed a petition against MHM to enforce the settlement agreement. A two-day non-jury trial was held in November 2017. The district court found Holland's emails on August 2, 3, and October 6, 2016, could reasonably be understood by Flix to be assent to the terms of the settlement agreement. The court found an enforceable settlement agreement existed and MHM was in breach of the agreement. The court awarded Flix attorney fees as provided in the lease agreement and settlement agreement. MHM appeals.

## II.      Standard of Review

"Determining the legal effects of a contract is a matter of law to be resolved by the court." *Galloway v. State*, 790 N.W.2d 252, 254 (Iowa 2010). Any disputed material facts surrounding a settlement agreement are resolved by the finder of fact. *Wende v. Orv Rocker Ford Lincoln Mercury, Inc.*, 530 N.W.2d 92, 94 (Iowa Ct. App. 1995). Our review of a contract interpretation is for correction of errors at law. Iowa R. App. P. 6.907; *Schaer v. Webster Cty.*, 644 N.W.2d 327, 332 (Iowa 2002). The district court's findings of fact are binding on us if supported by substantial evidence. *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa

2000). If a reasonable mind would accept the evidence as adequate to reach a conclusion, we consider it substantial for a finding of fact. *Id.* "Evidence is not insubstantial merely because it could support contrary inferences." *Strong v. Rothamel*, 523 N.W.2d 597, 600 (Iowa Ct. App. 1994). "We view the evidence in a light most favorable to the trial court's judgment." *Land O'Lakes*, 610 N.W.2d at 522 (citation omitted).

## III. Analysis

MHM claims no settlement agreement can exist, stating the parties did not agree on the meaning of the material terms in Article 36 of the lease agreement and the subsequent settlement agreement. "For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Schaer*, 644 N.W.2d at 338. "[M]utual assent is based on objective evidence, not on the hidden intent of the parties." *Id.* (quoting *Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 815 (Ariz. 1990)). Assent is normally recognized through offer and acceptance. *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001). The acceptance must match the offer "in all its conditions, without any deviation or condition whatever." *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005) (citation omitted). "A settlement agreement need not be reduced to a writing before it is enforceable unless required by statute or court rule." *Wende*, 530 N.W.2d at 95.

The district court found the objective evidence in the record established mutual assent to the terms of the fourth proposed settlement agreement. We find substantial evidence supports the district court's conclusion.

MHM points to testimony to support its claim the parties never agreed on the meaning of the settlement agreement's subordination obligations. Holland

testified she viewed the settlement agreement as an either-or between either termination of Flix's lease agreement with GBL or its subordination to the MHM lease agreement. However, from the first proposed settlement agreement, Flix offered to terminate the lease with GBL. MHM continued to require language limiting any potential GBL financing. MHM specifically requested changes in the first version of the subordination agreement which were incorporated. The language of the proposed subordination agreement between MHM and an unidentified bona-fide third-party lender then did not change from the second proposed settlement agreement provided to Holland in May 2016 through the fourth version of the settlement agreement as executed by Flix. After the initial changes requested by MHM, no other modifications were requested to the subordination agreement until Holland's December call.

The objective evidence provided to the court reveals the changes requested by MHM were accommodated by Flix to the extent MHM clearly communicated its requests. MHM, through Holland, largely approved the settlement agreement with the third proposed agreement subject to the addition of a provision noting nothing in the agreement could be construed as finding GBL qualified as a bona-fide third-party lender. A provision was added to that effect, and Holland told Borg it looked good. In October, Holland asked Flix to execute the document and stated MHM would execute second. Holland did not place any qualifications or conditions requiring further changes to the documents before execution.

After Flix executed the document, it performed its obligations under the settlement agreement. Flix terminated its lease with GBL, incurring a financial penalty. MHM delayed executing the document until an existing line of credit for

the remaining security deposit from Flix to MHM was extended three months. After the line of credit was extended, and two months after Flix had executed the agreement she had approved, Holland requested further modification of the agreement in a way that would limit Flix's ability to obtain financing and would modify the plain meaning of the third paragraph of Article 36. This request occurred at approximately the same time Flix reached twenty-four months of continuous operation, when, under Article 36, MHM's lien would be subordinate to any bona-fide third-party lender.

Holland's December request limiting any subordination to after-acquired property was a new and unexpected request to Flix. At trial, Holland testified she had explained her understanding of Article 36 to Borg in the May 11 call, but Borg recalled the discussion as framed around the timing of MHM's subordination of GBL's lease and objections to GBL as a bona-fide third-party lender. Holland also testified to only becoming aware Flix did not read Article 36 in the same way as MHM during pre-trial settlement conversations with Reagan and Silvers.

A review of the objective evidence supports Flix's interpretation of the clause. The language of the third paragraph of Article 36 makes no mention or implication limiting MHM's subordination rights after twenty-four months of operation to after-acquired property, despite the use of the "after-acquired" qualifier in the previous paragraph. Moreover, in Holland's email dated May 12, 2016, she requires "A subordination from GB Leasing to Merle Hay Mall up through February 1, 2017." The requested subordination did not specify it was limited for any equipment or property acquired through GBL through February 1; it could be understood to end the subordination February 1. We also note Holland testified

she was aware the limitation she requested in December made the property lease's subordination clause "useless" to Flix in obtaining outside financing.

We consider whether the objective evidence available at the time the agreement was entered into could support the district court's findings. In this analysis we do not consider the hidden intent that may have been later revealed during the trial process. Furthermore, we recognize that evidence supporting a contrary inference does not make the evidence insubstantial. *See Schaer*, 644 N.W.2d at 338; *Strong*, 523 N.W.2d at 600. Viewing the evidence in the light most favorable to the district court's judgment, we find substantial evidence exists to support a finding of an enforceable settlement agreement between Flix and MHM. A reasonable person viewing the objective evidence could conclude a mutual assent to the terms of the contract from Holland's emails in August and October; in particular the October statement, "If it is acceptable, please have Flix execute it and we will sign second," signaled objective assent to the terms of the agreement and constituted an offer. Flix then executed the settlement agreement and took actions to its detriment and for the benefit of MHM in conformance with the terms of the agreement, constituting acceptance of MHM's offer. It was only after Flix had executed the agreement and MHM had accepted the benefits of Flix's performance that MHM informed Flix it wanted different terms than the agreement Flix signed two months earlier at MHM's urging.

**AFFIRMED.**